## R. L. Perry *vs.* P. Perry.

By the common law of this state, the court of chancery had no jurisdiction to decree a separation between a husband and wife, for cruel treatment, or on account of a mere canonical disability.

A marriage merely voidable is valid for all civil purposes until its nullity has been pronounced by the proper tribunal; but by the common law the sentence of nullity, when pronounced, renders the marriage void from the beginning.

That part of the common law of England which renders a marriage contract absolutely void in certain cases, forms a part of the law of this state; and may be enforced by the appropriate tribunals independent of any statutory provisions.

The cruelty which entitles the injured party to a decree of separation, is that kind of conduct which endangers the life or health of the complainant, and renders cohabitation unsafe.

Where a right is claimed as existing by the common law, which is incapable of enjoyment except by the direct interposition of a judicial tribunal to give the remedy, if no tribunal has been organized for that purpose by the law making power we may fairly presume that no such right exists. But if the right is expressly declared by the legislative power without creating or appointing any particular tribunal to administer the remedy the power must be exercised by some of the existing tribunals of the country.

The 12th section of the act of March, 1824, authorizing the court of chancery to decree a separation from bed and board, on the complaint of the husband, was not repealed in the recent revision of the laws.

THE bill in this cause was filed by the complainant against his wife to obtain a divorce *a mensa et thoro*. It stated that the defendant was in the constant habit of intoxication; that she contracted debts, in the name of her husband, for liquors, &c.; that, in her fits of passion and drunkenness, she committed acts of cruelty and violence upon him and his children; that she broke and destroyed his windows and furniture, and that of his neighbors; that on one occasion she attacked the complainant in his sleep, and gave him a blow which wounded his head; and on another occasion she beat his children with clubs, and threw a billet of wood at his little daughter, which wounded the child and endangered its life. The bill also stated that the defendant threatened to poison the complainant, and actually procured arsenic for this purpose, and concealed it in her trunk, and that it was dangerous

for the complainant or his children to live with her. The defendant demurred to the bill, upon the ground that the court had no jurisdiction to grant the relief prayed for.

*J. B. Scoles,* for the complainant.

*W. C. Noyes,* for the defendant.

THE CHANCELLOR. There is no doubt that by the law of England, as it existed at the time of our separation from that country, and as it still exists there, such conduct as is charged by the complainant in this bill, if not produced by his own misconduct, would be sufficient to entitle him to a decree against his wife, in the proper court, divorcing her from his bed and board. Although the applications to the ecclesiastical courts in England for separation on account of cruelty, are generally on the part of the wife, yet all the writers on the subject admit the right of the husband to institute such a suit. (Oughton, tit. 193. 1 Black. Com. 441. Poynter's Mar. & Div. 210.) In the case of *Kirkman* v. *Kirkman,* in the consistory court of London, in 1807, (1 Hagg. Cons. R. 409,) Sir William Scott pronounced for a divorce from bed and board, in a suit promoted by the husband against his wife, for acts of violence and other cruel treatment on her part. I have before had occasion to say that divorces, even such as are only to release the parties from the obligation of cohabiting together, " should never be allowed, except for the protection of the innocent party, and for the punishment of the guilty." The common law has given to the husband sufficient power over the wife, to render the interference of a court unnecessary in all ordinary cases. But if a separation for cruelty and violence on the part of the wife is to be decreed in any case, the facts stated in this bill seem to present that case. The cruelty which entitles the injured party to a divorce, consists in that kind of conduct which endangers the life or health of the complainant, and renders cohabitation unsafe. (Poynter's Mar. & Div. 209.) If the charges in this bill are true; if this defendant permits her passions so far to usurp the throne of reason, as to allow her to perpetrate such outrages upon his children; to attack and

commit personal violence upon her husband in his sleep; to break and destroy his property; to threaten his destruction by poison, and even to go so far as to procure a deadly drug for that purpose, not only his health, but even his life is in actual danger from her violence. Cohabitation with such a wife is certainly unsafe, notwithstanding the powers with which the husband is armed by the common law to restrain the violence of her passions, and keep her in due subjection to his lawful commands. Whatever may be the common law on the subject, the moral sense of this community, in our present state of civilization, will not permit the husband to inflict personal chastisement on his wife, even for the grossest outrage. And no man of feeling would ever think of resorting to such a remedy, except in the heat of passion, if it were expressly given to him by a public statute. It remains to be considered whether this court has any jurisdiction or power to afford the necessary relief to a husband in such a case.

It is insisted on the part of the complainant, that, independent of any statutory provision on the subject, this court has the power to decree a separation in such cases; that so far as relates to the civil remedies of the parties, it possesses all the powers which are vested in the ecclesiastical courts of England in matrimonial causes.

In *Wightman* v. *Wigtman*, (4 John. Ch. R. 343,) Chancellor Kent certainly did assume a jurisdiction which in England is at this time exercised exclusively by the ecclesiastical courts. In that case he made a decree declaring a marriage void, on the ground that the complainant was a lunatic at the time the marriage was celebrated. And the reasoning of the court in that case goes far towards establishing the doctrine contended for by the complainant here. In *Ferlat* v. *Gojon*, (1 Hopk. R. 478,) Chancellor Sanford also made a decree declaring a marriage void, on the ground that the consent of the complainant thereto was obtained by fraud and terror, and that the marriage had never been consummated by cohabitation. The decision in the last case is put upon the ground that there is a jurisdiction in the court of chancery in England, concurrent with that of the ecclesiastical courts, to declare such a marriage void, on the ground of the duress and

fraud; the latter being one of the general grounds of juris-diction in the court of chancery. In the subsequent case of *Burtis* v. *Burtis*, (1 Hopk. R. 557,) which was a suit to an-nul a marriage contract, on the ground of the physical inca-pacity of the defendant, Chancellor Sanford decided that this court had not jurisdiction in such a case. That the law of England concerning divorces and matrimonial causes, as the same was administered in the ecclesiastical courts of that country, was never adopted as a part of the law of the colo-ny, and therefore did not become a part of the law of this state, at the time of our separation from the mother country.

That part of the ancient common law of England which rendered a marriage absolutely void, where either of the par-ties had not the legal capacity to contract matrimony, or where there was in fact no legal consent by one of the par-ties, the same having been obtained by force and fraud and never afterwards voluntarily acquiesced in, was undoubtedly brought to this country by our ancestors and formed a part of the law of this colony. In such cases, for all the sub-stantial purposes of justice, the courts of common law and of equity in England had concurrent jurisdiction with the ec-clesiastical courts. Although the other courts yielded to the courts christian the exclusive jurisdiction to declare the nullity of the marriage by a direct proceeding between the parties, it was rather on the ground of convenience than from a want of power in the court of chancery to grant similar relief to the parties. The court of chancery and courts of common law always exercised the power to de-clare the marriage absolutely void, whenever the question came before them in any collateral proceeding. (*Betsworth* v. *Betsworth*, Styles' R. 10. *Riddleson* v. *Wogan*, Cro. Eliz. 858.) In those cases the sentence of the ecclesiastical courts does not dissolve the marriage, inasmuch as no lawful mar-riage can have taken place. It merely declares the fact of marriage to be a nullity. (Poynter, 156.) In the case of *Bowzer* v. *Ricketts*, ( 1 *Hagg. Cons. R.* 214,) Sir William Scott says : " The marriage act declares marriages in such cases to be *ipso facto* void. The sentence of the ecclesiasti-cal court is declaratory only ; it does not make them void." In such cases, where the rights of the parties existed inde-

pendent of any peculiar remedies which were entrusted to the exclusive cognizance of a particular court, it was competent for the superior courts of the colony to administer such relief as was consistent with their ordinary forms of proceedings in other cases, and such as was proper under the circumstances of each case. But I doubt whether this principle extends to any of that numerous class of cases in which the ecclesiastical courts were in the habit of dissolving the *vinculum* of the marriage, on the ground of some pre-existing canonical disability; such as consanguinity, or affinity, within the prohibited degrees, physical incapacity, &c.

Chancellor Kent evidently thought some of those marriages were absolutely void, even if no sentence of nullity was pronounced; but in general they are only voidable by the sentence of the appropriate tribunal. Poynter says : " A marriage merely voidable is valid for all civil purposes, until by a sentence, its nullity has been pronounced; and when a marriage is voidable, on the ground of a canonical impediment only, the sentence of the court is interposed to annul it, as a state in which the parties cannot continue without endangering their souls' health, and causing the profanation of matrimony." (Poynt. Mar. & Div. 154.) In those cases, however, if a marriage *de facto* is annulled by the ecclesiastical court during the life of the parties, it renders it void from the beginning, and bastardizes the issue thereof; but if not so dissolved, the issue are legitimate. ( *Elliot & Sugden* v. *Gurr*, 2 Phil. Eccl. R. 16. *Harris* v. *Hicks*, 2 Salk. 548.)

Where the right claimed as a common law right is of such a nature that it cannot be enjoyed in any manner, except by the direct interference of a judicial tribunal to give the remedy, if no tribunal has been organized by the law making power for that purpose, we may fairly conclude the right does not exist. But whenever the legislature distinctly give the right, without creating or appointing any particular tribunal to administer the remedy, it is fairly to be inferred that they intended to vest that power in some of the existing tribunals of the country. As the right to dissolve a marriage

1831.

Perry
v.
Perry.

*de facto* which was merely voidable, could only be exercised by the aid of the ecclesiastical court in England, and as no such court was ever organized here, and no other court exercised any such jurisdiction for more than one hundred years, it may reasonably be presumed the right did not exist ; and that this part of the law of England was never in existence in this colony. Such a jurisdiction, therefore, cannot now be exercised here, by any court, without the direct or implied sanction of the legislature.

The decision of Chancellor Sanford, in *Burtis* v. *Burtis,* is therefore entirely consistent with that of his predecessor, in *Wightman* v. *Wightman,* before referred to, so far as relates to the point actually before the court in the last mentioned case. In the one case, the marriage was absolutely void ; and this court, in the exercise of its ordinary jurisdiction, had a right to remove the apparent obstruction to the wife's contracting matrimony with any other person. In the other case, there was a good marriage *de facto ;* and the court very properly decided that the power to dissolve such a marriage did not then exist in this state, except by the interference of the legislature.

The principles on which Chancellor Sanford's decision rests, appear to be equally applicable to the case now under consideration. And I conclude that this court has no power to decree a separation between these parties on the complaint of the husband, unless the powers conferred upon it by the 12th section of the act of April, 1824, (Laws of 1824, ch. 205, p. 249,) are still in force, as to this case. Such was the opinion expressed by Chancellor Kent, in *Van Vechten* v. *Van Vechten,* ( 4 John. Ch. R. 501,) notwithstanding what he had said as to the jurisdiction of the court in matrimonial causes, in *Wightman* v. *Wightman.*

The general repealing act of December, 1828, ( 2 R. S. 779, § 5, ) declares that the repeal thereby of any statutory provisions shall not affect any act done, or right accrued, or established, &c. previous to the time when such repeal shall take effect ; but every such act or right, &c. shall remain as valid and effectual as if the provision so repealed had remained in force. If I have succeeded in showing that the right

and the remedy, in a case of this kind, were so blended together that the one could not exist without the other, the abrogation of this remedy necessarily destroyed the right. As the acts complained of in this case took place previous to January, 1830, when the repealing act took effect, if the right of the husband to a decree of separation ever existed it must have accrued before that time; and the right may still be enforced, even though this provision in the law of April, 1824, were embraced in the repealing act.

But the counsel for the complainant also thinks he has discovered that the act of 1824, so far as it relates to this subject, is not in fact repealed, and that it remains in full force; subject however to the modifications contained in the 11th and 12th sections of the repealing act. The revisers, and probably the members of the legislature who assisted in the revision of the laws, intended to repeal and abrogate this provision, in favor of the husband, contained in the act of April, 1824. Believing this to be the fact, I have carefully examined the several provisions of the repealing law, under a hope of finding some clause which, either in terms or by implication, repeals that provision, and thus effectuates the probable intention of the members of the legislature. But I regret the necessity which compels me to say that the counsel for the complainant is right; and that the 12th section of the act of 1824 is not repealed.

This section is found at the end of a local statute, altering the terms of the county courts in some few of the counties. It was probably placed there for the purpose of procuring its passage through the legislature, without comment or examination, just at the close of the session. This singular course, of coupling it with a local act to which it had no relation, in order to get it through the legislature originally, has probably caused it to be overlooked a second time, in preparing the repealing act; and it is thus retained as a part of the existing law of the state, contrary to the probable intention of the legislators who revised the laws. The title of the act gives no intimation that any such principle is embraced in its provisions. The act itself is therefore not set out

by its title in the repealing law, as was done in relation to most of the old statutes which were revised, or were intended to be abrogated and repealed. But the first eleven sections of the act are repealed by a sweeping clause, embracing all statutes and parts of statutes prescribing or altering the times of holding the county courts. The general clause repealing "all statutes and parts of statutes consolidated and re-enacted in the revised statutes, or repugnant to the provisions contained therein," does not reach this part of the act of 1824; because it is not repugnant to any provision of the revised statutes, but was simply intended to be 'left out of the revision, and to be repealed. It is referred to in the revisers' list of acts " omitted," &c. which was submitted to the legislature near the close of their labors, as a section intended to be repealed, (page 1 & 121 of list:) but by accident it was overlooked in preparing the details of the repealing law. And by the operation of the 10th section of that act, the general law of 1813, relative to divorces, which is repealed by its title, as well as by the operation of the general clause repealing all statutes consolidated and re-enacted in the revised statutes, remains unrepealed for all the purposes of this provision in favor of the husband.

The demurrer in this case must be overruled, and the defendant must put in her answer to the complainant's bill within the time prescribed by the 49th rule. As she has no separate property, no costs are allowed against her.