## ALICE CAST, *Respondent, v.* ERIC M. CAST, *Appellant.*

JURISDICTION IN DIVORCE CASES.—The jurisdiction of the District Courts in divorce cases does not depend on Territorial Statutes, but if such were the fact, the Legislature of the Territory has conferred jurisdiction on these courts by " An Act regulating the mode of procedure in civil cases in the Courts of the Territory of Utah," approved Dec. 30, 1852, and " An Act in relation to the Judiciary," approved Jan. 19, 1855.

CHANCERY JURISDICTION OF THE DISTRICT COURTS.—The District Courts have Jurisdiction in all suits for divorce, by virtue of their Common Law, and Chancery powers conferred by the Organic Act.

ID.—The statute in relation to divorces having given the right to a dissolution of the marriage contract, for the various causes mentioned, but failed to provide a competent tribunal to hear and determine suits of that character, the jurisdiction in such cases necessarily attaches to the District Courts of the Territory, as Superior Courts of General Jurisdiction.

ACT CONFERRING JURISDICTION UPON PROBATE COURTS, VOID.—The Territorial Legislature has no power, under the Organic Act, to confer jurisdiction on applications for divorce upon the Probate Courts; it therefore follows that the sections of "An Act in relation to Bills of Divorce," approved March 6, 1852, which purport to confer such jurisdiction, are void.

PROBATE COURTS INFERIOR TRIBUNALS.—The Probate Courts are inferior tribunals, and their jurisdiction cannot be inferred, it must be given by positive law.

EQUITY PROCEEDINGS.—The proceeding in divorce cases belongs properly to the equity side of the court.

ALIMONY, WHEN ALLOWED.—The right to alimony follows as a matter of course, if the Respondent is entitled to a decree of divorce.

APPEAL from the District Court of the Third Judicial District.

The facts appear in the Opinion of the Court.

*Snow & Hoge* for Appellant.

No authorities on file for Appellant.

*Tilford & Hagan,* and *W. W. Gee,* for Respondent.

1. The first, fourth and eighth sections of the Territorial Statute in relation to divorces are void and invalid, for the reason that they attempt to confer jurisdiction on the Probate Courts in applications for divorce. These sections of the Statute are in conflict with the Organic Act, and necessarily without force. (Moore *v.* Konsbly, Idaho R., 55-62; Landon *v.* Bartley, Idaho R., 223; Locknane *v.* Martin, Kansas R., 67; Sec. 9, Organic Act.

2. The Territorial Legislature having given a right to divorce, but neglected to designate a court of competent jurisdiction to hear and decide suits for a dissolution of the marriage contract, the jurisdiction in such cases devolves of necessity and right on the District Courts as tribunals of general jurisdiction. (Wightman *v.* Wightman, 4 John., C. R. 343; Perry *v.* Perry, 2 Paige 505.)

3. If it be conceded that the jurisdiction of the District Courts in divorce cases depends on Territorial. legislation, Respondent claims that such jurisdiction has been conferred by the 2d sec. of " An Act in Relation to the Judiciary, approved Jan. 19, 1852." By that section, jurisdiction is conferred on the District Courts, " both in civil and criminal cases, and as well in Chancery as at Common Law."

BOREMAN, J., delivered the Opinion of the Court.

This is a suit for divorce from the bonds of matrimony and for alimony, which was instituted by the Respondent against her husband, in the Third District Court of the Territory, wherein a decree for divorce and alimony was entered. and thereupon the Defendant appealed to this c urt.

The only question raised and involved is as to the jurisdiction of the District Court to hear and determine

the case.. The objection to its taking cognizance thereof is based solely upon the ground that divorce is "neither the subject of common law nor equity jurisdiction" but is a "special proceeding and purely statutory." It is further claimed that the only statute which controls this matter is Territorial, and embraced in one enactment, entitled, "An Act in relation to Bills of Divorce,". approved March 6th, 1852. By the terms of this law, divorce is committed to Probate Courts, and no allusion is made to the District Courts. These facts, it is claimed, exclude the subject for consideration in the District Courts.

If it be true that this jurisdiction depends entirely upon Territorial statute, it does not follow that it depends entirely upon the one particular statute referred to. Other statutes may cover the same subject matter, and in order to reach a correct conclusion as to the powers granted, and the intention of the Legislature, the examination should extend to all Territorial enactments bearing upon the point at issue.

The Legislature, nearly ten months after the divorce act, created the law entitled, "An Act regulating the mode of civil procedure in civil cases in the courts of the Territory of Utah," approved December 30th, 1852, which provides: "Section 1. That all the courts of this Territory shall have law and equity jurisdiction in civil cases," and the last section thereof repeals all conflicting statutes. These terms seem to confer a general jurisdiction and make no exceptions. The natural deduction is that no exceptions were intended, or had in view, but that the purpose was to embrace all civil suits in this general grant of jurisdiction. Mr. Justice Story conveys the same idea in the following broad language: "The remedies for the redress of wrongs and the enforcement of rights, are distinguished into two classes; first, those which are administered in Courts of Common Law; and secondly, those which are administered in Courts of Equity." (1 Story's Eq. Juris, par. 25.)

If divorce be a "remedy for the redress of wrong,"

or for the enforcement of a right, it belongs to one of these two classes—either of the class administered in Courts of Common Law or to the class administered in Courts of Equity. And if to either class, then this statute confers the jurisdiction upon the District Courts, and so much of the divorce act as seems to confine such cases to the Probate Courts, is by the repealing clause referred, expressly negatived. This Civil Procedure Act was, subsequently, " so far as in conflict" with the code of 1870, repealed; but as there is no conflict so far as this question of jurisdiction is concerned, it remains unimpaired. In addition to this, the code of 1870 bears out the same general idea that the District Courts have jurisdiction in all civil cases.

Over two years after the above mentioned enactments of 1852, the Legislature manifested this same intention in still broader terms in " An Act in relation to the Judiciary," approved Jan. 19, 1855, in the first section of which we read that " the District Courts shall exercise original jurisdiction, both in civil and criminal cases," when it is not " otherwise provided by law." The reverse of this general grant of power must be provided in some law. The granting of a particular jurisdiction to the Probate Courts is not sufficient to negative this, nor does this enactment affect the jurisdiction of the Probate Courts, but the District Courts shall have the jurisdiction also, in that as in all other civil cases, unless some other law says they shall not have it. The divorce act itself does not so provide, and it has not been claimed that such a provision anywhere exists. By inference alone can the conclusion be drawn from the divorce act that the District Courts are to be excluded from jurisdiction in divorce. It will not do to say that inference is what is intended, or allowed, by the words " otherwise provided." These words require an express negative of the power. Divorce is a " civil" or a " criminal" suit, and of course no one claims it to be the latter. It is a civil suit, whether we call it a suit at law or in equity, or whether we call it a special proceeding and *sui generis.*

Let us now advert to the question of the power of the Legislature to pass the divorce act. This act specifies the causes for which divorce can be granted, and it likewise gives directions as to the manner of proceeding in such cases, and purports to confer the jurisdiction thereof upon the Probate Courts. The authority of the Legislature to specify the causes of divorce and to direct the manner of proceeding, is not questioned. But it is claimed that that act, so far as it confers the jurisdiction upon Probate Courts, is in conflict with the Organic Act, and therefore null and void.

The authority of the Legislature to confer such power upon the Probate Courts, is based upon that portion of the " Organic Act" which reads as follows: (Sec. 6.) " That the Legislative power of said Territory shall extend to all rightful subjects of legislation, consistent with the constitution of the United States and the provisions of this act." The "subject" must not only be " rightful," but also " consistent" with the Organic Act.

The latter clause of this sixth section, respecting the admission of the laws to Congress and its disapproval, cannot be relied upon in this case. If an act of the Legislature be already void, the disapproval of Congress is not necessary. Such disapproval is only necessary to make void that which is otherwise valid. When the matter considered is a rightful subject of legislation, and consistent with the Constitution of the United States, and with the Organic Act, but yet is inexpedient and unwise, it would be necessary to invoke the disapproval of Congress to invalidate it. But any act of the Legislature which is not consistent with the Constitution of the United States, or which is not consistent with the provisions of the Organic Act, is null and void, and it seems impossible that Congress should have intended to require its disapproval of such acts, that it should have intended to require its disapproval to make void that which is already void. The case of Clinton *v*. Engel-

brecht, " slightly understood," lays down no such doctrine.

By the Organic Act the "judicial power" of the Territory is divided into ·four distinct branches, and vested respectively in a Supreme Court, District Courts, Probate Courts and Justices of the Peace. The necessary deductions are that four kinds or qualities of jurisdiction were intended, and that these kinds or qualities were to be distributed in a manner usual to like courts in the States. If a jumbling of jurisdictions was to be allowed, the division of the judicial power was wholly unnecessary, and this commingling of jurisdictions is comparatively unknown under like Organic acts, except in Utah.

But our Organic Act does not stop with this simple division of the "judicial power" into four heads—it goes farther, and provides that the District Courts shall be vested with the same jurisdiction as is vested in the Circuit and District Courts of the United States, and in addition thereto provides that " the jurisdiction of the several courts herein provided for, both appellate and original, and that of the Probate Courts and of Justices of the Peace shall be as limited by law; provided that Justices of the Peace shall not have jurisdiction of any matter in controversy when the title or boundaries of land may be in dispute, or when the debt or sum claimed shall exceed one hundred dollars; and the said Supreme and District Courts respectively shall possess Chancery as well as Common Law jurisdiction." (Sec. 9). The jurisdiction here vested refers especially to cases arising under Territorial laws. If the Territorial law should give the right, and that was such as was recognized at Common Law or in Chancery, or such as required Common Law principles or equitable principles, to be invoked to grant the relief, the jurisdiction belonged to the District Court as original, and the Supreme Court as appellate, unless the prior words, " be as limited by law," were intended to give the Legislature the power to otherwise provide. Let us look at this matter. This fundamental

act says that the jurisdiction of the courts—all Territorial courts—shall "be as limited by law," provided "the said Supreme and District Courts shall possess Chancery as well as Common Law jurisdiction." The jurisdiction of the various courts may "be as limited by law," with the proviso, and so far as any attempt of the Legislature conflicts with the proviso, it is null and void. The proviso is as much a part of the statute and as binding upon the Legislature, as the express grant to which the proviso is attached. The Legislature may limit the jurisdiction, but in doing so must not come in conflict with the provisos mentioned, or other parts of the Organic Act. The Legislature may limit the jurisdictions of these courts, fix the respective boundaries of each court, and detail the general powers of the respective courts—this must all be done according to the authorities as given in the Organic Act. The Legislature cannot deprive any court of the jurisdiction granted to such court in the Organic Act. That jurisdiction is above the reach of legislative enactment. Dunphey v. Kleinsmith, 11 Wallace, 610. It is a rule which we conceive to be well settled in the United States, that no court can have any jurisdiction except such as is conferred by the power which created the court, or by a Legislature endowed with express authority to confer such jurisdiction. (Kent Com., p. 334, 336; United States v. Hudson, 7 Cranch, 32; Wharton's Crim. Law; par. 163.)

It is claimed that jurisdiction in divorce can only be taken by express enactment of the Legislature. Equally express must be the authority bestowed upon the Legislature. If the Legislature can claim such a power by irresistible implication of the fundamental law, then also with like irresistible implication can the District Courts claim such jurisdiction under Territorial statutes, aside from the Organic Act.

The Constitution of the United States created the Supreme Court of the United States and gave a general outline of its jurisdiction. In like manner our Organic Act created the District Courts and gave a general outline

of their jurisdiction.   It nowhere, except as is embraced in the name, gives any jurisdiction, in express language, to the Probate Courts.   The delineation of power contained in the Constitution of the United States, as belonging to the Supreme Court, and the inferior courts to be thereafter created, " is now regarded as nothing more in this respect than a power vested in Congress to confer jurisdiction, in its discretion, within those limits.   (Abbott's U. S. Court Practice, p. 185.)

Mr. Justice Baldwin, in delivering the opinion of the Supreme Court of the United States, in the case of Rhode Island *v.* Massachusetts (12 Peters, 457, 721), says:  " It was necessarily left to the legislative power to organize the Supreme Court, to define its powers consistently with the constitution, that constitution having "delineated only the great outlines of the judicial power, leaving the details to Congress."   To use a later legal term of the United States Supreme Court, the constitution only " chalked out" the boundaries of the jurisdiction.

Itis just so in regard to our  Territorial courts.   The Organic Act gave only the outlines of jurisdiction, leaving to the Legislature the organization of the courts and the details of jurisdiction, all, however, to be consistent with the outlines given, just as those of Congress were to be consistent with the constitution.  And this and nothing more is the plain meaning of those words, " as limited by law."

The outlines of the jurisdiction given to the District Courts are in the name and in the words, " Chancery as well as Common Law jurisdiction."   The outlines of jurisdiction given to the Probate Court are nothing save and except such as are embraced in the name itself.   In filling up the details of jurisdiction to the District Courts, the Legislature is guided by the name and the words, " Chancery as well as Common Law jurisdiction." In filling out the duties of jurisdiction to the Probate Courts, the Legislature can alone be guided by the name; and to do so, the Legislature can confer no jurisdic;

tion upon the Probate Courts except such as is usual to such courts. Had Congress intended more, it would have been as easy to say so in this connection as it was in connection with the District and Supreme Courts. Probate Courts are inferior Courts and no jurisdiction can be inferred—it must be given by positive law. (Peacock v. Bell, 1 Sanders, 74.)

The District Courts are not inferior courts, within the meaning of the language as used in the books. (Hurd on *habeas corpus*, p. 348-9; Territorial Laws, ch. I., sec. 1, p. 29.)  Much can be inferred in their favor.

If the Legislature could infer authority to empower the Probate Courts to grant divorces, it could in like manner and with equal reason, bestow such power upon Justices of the Peace. The Organic Act does not say, in direct language, that it shall not do so. But the very idea shows at once how unsound is the assumption of the Legislature to bestow such power upon the Probate Courts.

Whether as a fact it be true or not, it is presumed that the Legislature is willing to act in harmony with national law and American ideas and principles and to do so it must notice the general character of the courts throughout the nation, and can not, without well grounded authority, attempt to commingle and mix up the jurisdictions of the Territorial tribunals created by the Organic Act, contrary to the well known and recognized powers of such courts in the States of the Union and contrary to the intention manifested in the Organic Act. As therefore the Legislature is not vested with any power to confer jurisdiction, in divorce, upon Probate Courts, it follows that the attempt to do so is nugatory and that the Divorce Act, in so far as it grants jurisdiction to Probate Courts, is void.

We now, at this stage of our examination, find that we have a statute which authorizes divorce and specifies the causes for which it may be granted. But no tribunal is designated in specific terms, to take such jurisdiction.

What course should be pursued? We have no Ecclesiastical Court, and none were ever known on American soil, even in colonial times. In the absence of such tribunals, it becomes the duty of the District Courts, they being courts of general jurisdiction, superior and not inferior courts, to step in and take such jurisdiction, that the law may not fall or fail for want of a proper tribunal.

"If the Legislature," says Mr. Bishop, "should establish a system of laws, not mentioning any court in which they are to be enforced, the tribunal best adapted to enforce them, ought to take the jurisdiction." (1 Bishop on Marriage and Divorce, par. 19, n. 1; Perry v. Perry, 2 Paige, 501.) And such a court is generally a court of equity. (Rose v. Rose, 4 Eng. (Ark.) 207, 512; 1 Story's Eq. Juris., par. 53.)

The District Courts, by the language of the Organic Act, were made courts of general common law and chancery jurisdiction. But these broad terms do not, as it is claimed, embrace divorce, because that is "neither the subject of common law nor chancery jurisdiction." We cannot believe that Congress intended to form these courts upon such a cramped model. The very name is wholly American, not English, and imports something that is American. And the very language of the law, " Chancery as well as Common Law jurisdiction," presupposes the idea of an already existing common law jurisdiction conferred in the name itself.

If we are to discard the broad and liberal sense in which the words Chancery and Common Law jurisdiction are supposed to be used, we render these almost lifeless words, and District Courts must depend upon Territorial statutes for their jurisdiction. If we are to confine such jurisdiction to the narrow list of the cases usually cognizable in the Common Law Courts and Chancery Courts, technically so called in England, then rights exist in this Territory that can be asserted in no existing court, and wrongs exist that no known tribunal among us can remedy. A mechanic's lien law is found upon our statute

16

book, and no court designated in which such lien can be enforced, and such a lien was unknown to the English Common Law Courts and Courts of Chancery. What tribunal can take the jurisdiction?

At the present term of this court two cases have been submitted to us in regard to adverse mining claims, the cases arising under the 7th section of the United States mining law of 1872. The law says that the matter in dispute shall be submitted to a tribunal competent to take the jurisdiction, and no court is specified. What tribunal shall assume to dispose of the matter? The matter was wholly unknown to the Common Law and Chancery Courts of England, technically so-called. Are parties to be remediless? We cannot consent to such a view of the matter.

Mr. Justice Story, in speaking of equity, says: "It has an expansive power, to meet new emergencies; and the sole question, applicable to the point of jurisdiction, must from time to time be, whether such rights and wrongs do exist and whether the remedies therefor in other courts, and especially in courts of common law, are full and adequate to redress." This is the true character of a Court of Chancery. (1 Story's Eq. Juris., par. 53.) New subjects and new rights are continually arising, and even in England the expansive nature of the chancery jurisdiction is such that "the jurisdiction may be deemed in some sort a resulting jurisdiction in cases not submitted to the decision of other courts by the Crown or Parliament as the great fountain of justice." (1 Story's Eq. Juris., par. 43.) On the other hand we turn to the Common Law, and Common Law includes everything of jurisdiction that is not equitable, and in its broadest sense includes even equity itself and also admiralty, (United States *v.* Coolidge, 1 Gall., 489; 1 Abbott's U. S. Practice, par. 196; Story's Eq. Juris, par. 41, note 11); and likewise the Common Law (1 Bl. com., par. 79.) In the United States courts, Common Law embraces "all those proceedings in which legal rights are to be ascertained and determined, whether they be the

old, long settled proceedings of the Common Law or new legal remedies, different, it may be, from the old Common Law forms, but proceeding according to the general course of Common Law principles as contra-distinguished to those where equitable rights alone were recognized and equitable remedies administered, as well as in contradistinction to those where, as in admiralty, a a mixture of public law, maritime law and equity, is often found in one proceeding." (1 Abbot's U. S. Ct. Pr., p. 193; Parsons v. Bedford, 3 Peters, 433, 446 ; Parish v. Ellis, 16 Peters, 451.)

The Common Law which our fathers brought to this country from England, includes, not only the principles administered in what are technically termed the Courts of Common Law, but in all other tribunals. (1 Bishop on M. & D., par. 39.)

The Ecclesiastical Law is a part of the Common Law (1 Bishop on M. & D., pars. 56, 57, 68, 71, 75) and ecclesiastical jurisdiction is derived from the Common Law. (Bac. Ab., tile "Ecclesiastical Courts," letter. "E.") And "the matrimonial law of England is the Common Law of this country," as we are told in the books. (1 Bishop, M. & D., par. 31.) The Common Law is the groundwork of all jurisdiction; and the Common Law Courts existed centuries before Chancery Courts or Ecclesiastical Courts were known in England. Prior to the Norman conquest, the powers of what has since been known as Common Law Courts, Chancery Courts, and Ecclesiastical Courts, were all united in one court and embraced in one jurisdiction. Chancery jurisdiction was almost unknown and Ecclesiastical jurisdiction, as exempt from lay jurisdiction, had never been heard of. The courts then existing were presided over by laymen and ecclesiastics together, and belonged as much to the one as to the other. William the Conqueror ordered, by statute, a separation between the lay and the ecclesiastical powers of these courts, and established separate tribunals, and "forbade tribunals of either class from assuming cognizance of cases belonging to the

other." (Bouvier's Law Dict., title, "Ecclesiastical Courts;" 1 Bishop on M. & D., par. 50.)

The Common Law Courts, before the Conquest, before Chancery Courts had grown up, and before the ecclesiastical tribunals had been called into existence, exercised the same jurisdiction in divorce that the ecclesiastical courts afterwards did, and granted the same kind of divorce as was afterwards granted in the ecclesiastical courts. None of these tribunals, either those existing before or those coming into being after the Conquest, were empowered to grant any divorce, except " *a mensa et thoro.*" And at the date of the organization of the Territory of Utah, the ecclesiastical courts of England had no power beyond that, and had no jurisdiction to grant a divorce *a vinculo matrimonia.* Such as is prayed for in the case before us, could not have been granted in the ecclesiastical courts. It is a suit for divorce from the bonds of matrimony. (1 Bishop, M. & D., par. 30.)

In America a divorce is commonly taken to mean an absolute severing of the bonds of matrimony, and not merely a separation from bed and board. And this absolute divorce is the kind referred to in our Territorial statute. No ecclesiastical court ever took cognizance of such cases. Parliament alone, in England, could grant absolute divorces. (Story's Conflict of Laws, par. 202; 1 Bl. Com., 440–1; Story's Equity Juris., par, 1427, note.)

If we are to follow English, instead of American models, in fashioning our jurisdiction in divorce cases, we cannot go to the ecclesiastical courts, but must go direct to Parliament—direct to our Legislature. But Congress has set its seal of condemnation upon this policy. The Territory of Florida took this view of the matter, and accordingly assumed to grant divorces by its own enactments. Congress very promptly dissented from this view, and at once, in 1824, annulled all such Territorial enactments. From that day to the present time no Territorial Legislature, so far as my knowledge goes, has presumed to take upon itself such power, recognizing

fully that Congress disapproved of the exercise of such power, when no express authority therefor had been given. But Parliament itself never granted divorces *a vinculo*, except for adultery (Bou. Law Dic., title " Divorce.") Hence even our Legislature could have no pretence for assuming such power, even aside from the disapproval of Congress, save and except for the cause of adultery.

Hence, if we are to go to England for precedent and authority in divorce jurisdiction, we can find none except Parliament, and that for one cause only. No tribunal of justice there exercises such power. This, it would seem, is enough to show that the language, " chancery as well as common law jurisdiction," does not refer merely to matters and cases taken cognizance of in these English courts, but refers more especially to the " bed-rock" principles which underlie all these courts, and to comprehend every right that needed enforcement and every wrong which required a remedy.

In most of the States of the Union, divorce is classed among suits at law and tried by jury, and in others it is considered a proceeding in chancery. And generally it has not been assumed by the courts, except upon statutory authority or for causes arising prior to marriage when there was no statute. In Bacon's Abridgement (title, " Marriage") it is said that the ecclesiastical courts could not grant divorce *a vinculo* for any cause occurring subsequent to marriage. The inference might be drawn that they had jurisdiction when the cause arose prior to marriage. And suppose this to have been true. Then any causes of which a court of chancery should certainly not take cognizance, would be those which arose prior to marriage, for such were peculiarly under the care of the ecclesiastical courts and could not be assured elsewhere, except upon statutory authority. Yet we find that, of all the causes for divorce, the chancery courts of this country are inclined to take these cases rather than any other. Chancellor Kent, in speaking in a court of chancery, of divorce, says: " Whatever civil authority ex-

isted in the ecclesiastical courts, touching this point, exists in this court, or it exists nowhere, and all direct judicial power over the case is extinguished, but that is hardly to be presumed." The case before him was one founded upon a cause existing at the marriage, and the Court, without hesitation, assumed the jurisdiction as part of the inherent powers of a court of chancery. (Wightman *v.* Wightman, 4 Johnson's Chy. R., 343.)

And we understand it is admitted, in the case before us, that courts of chancery can take jurisdiction of divorce cases for causes arising anterior to marriage. Which of all others are the cases they should not take cognizance of, if we are to follow the rigid rule which it is proposed by the Appellant that we should follow.

No American court could grant a divorce from the bonds of matrimony unless the statute give the causes for such divorce. And we think it will be found that, where such a divorce has been sought in an American court of chancery and refused, there was no statute in existence giving causes for divorce. In this Territory we have such statute, and it requires only the application of common law and equitable principles to carry them into effect. We have been referred to no decision where the grounds for divorce were given by statutes, and where no court specified to take the jurisdiction, and upon no reasoning have we a right to infer that a chancery court would, in such a case, allow the statute to lie dead and the wrong unremedied.

Chancellor Kent tells us that "all matrimonial and other causes of ecclesiastical cognizance belonged originally to the temporal courts, and after the spiritual courts cease, the cognizance of such causes would seem, as of course, to revert back to the lay tribunals." (Wightman *v.* Wightman, 4 Johnson, Ch. R., 347.)

We have no ecclesiastical courts, and if we had, they could have no jurisdiction in the case before us. We have only two sides to any court in this country—a law side and a chancery side, and whether divorce falls to the one side or the other, it belongs to the District Court.

The proceedings under the Territorial statute are more akin to the chancery than the common law side of court. A suit under this statute is virtually a suit in chancery. The very gist of the action is an appeal to the conscience of the Chancellor and not to the verdict of a jury.   The proceedings are not after the character of the ecclesiastical courts, the relief is not such as could be granted in those courts and the grounds of relief were wholly unknown in that court for such a divorce.' Hence we can see no good reason for a court of chancery refusing to take such jurisdiction in such cases, especially as chancery can give a more complete relief than a direct proceeding at law.   Chancery is a superior court and chancery jurisdiction is a superior court jurisdiction, and everything is supposed to be done within the jurisdiction of said court, unless the contrary especially appears. · (2 Bac. ab., p. 526.)

No analogy for a contrary view from what we have taken, can be drawn, as to chancery powers, from the fact that in England a new divorce court has been created, with the Probate Judge as judge ordinary thereof; for the Lord Chancellor himself stands at the head of that court, and is authorized to take that position in such court whenever he may deem it proper.

The Supreme Court of the United States have, in the late case, but upon a totally different subject, given some dicta, which, by some, is supposed to bear upon the question involved in this case.   Upon a fair and candid examination, however, of such dicta, we do not think that such will be found to be the case.

In respect to alimony, there seems to be no difference of opinion, if the granting of the divorce be proper.

Upon the whole case, therefore, we conclude that in divorce, as in all other civil cases, the Territorial statutes have conferred jurisdiction upon the District Courts; that the attempt to confer such power upon the Probate Courts was wholly nugatory, and in conflict with the Organic Act, and that such grant of power to the District Courts by the Territorial statutes was wholly un-

necessary, as under the Organic Act, such power was already vested in the District Courts as part of their general jurisdiction. Therefore the judgment of the Court below, both as to divorce and alimony, is affirmed.

McKEAN, C. J.:

I concur in the conclusion, that the judgment of the Court below must be affirmed, and reserve the right hereafter to file my opinion in writing.

EMERSON, J., dissented.