## NEW YORK SUPREME COURT.

### MARGARET RUCKMAN agt. ELISHA RUCKMAN.

*Divorce a mensa et thoro — what necessary to be shown to entitle a wife to a decree for alleged cruelty and abandonment.*

To entitle a wife to a divorce *a mensa et thoro,* under the first and second subdivisions of the statute (2 *R. S.,* 147, *sec.* 51), there must either be actual violence or a reasonable apprehension of bodily injury.

Wounded susceptibilities will not suffice ; occasional outbursts of passion will not do ; nor mere abuse, however gross.

Words of menace, however, are sufficient, if they be of such a character, and accompanied by such circumstances, as to justify a belief in their seriousness. That is, they must impress the person to whom they are addressed, not as idle words, not as a form of intemperate expression, but as importing action, and in that sense conveying the reality of a threat of bodily harm.

Jeopardy to health also comes within the rule.

Although words in form threatening were uttered, yet where, upon a patient and thoughtful review of the entire evidence, the court are satisfied that the language used was a mere exhibition of coarse and vulgar passion, that the defendant never for a moment contemplated physical violence, and that the plaintiff never believed herself to be in the slightest jeopardy :

*Held,* that the action should be dismissed.

To justify a judgment for limited divorce on the ground of abandonment, such circumstances must appear as manifest *a settled and determined purpose in the husband to withdraw from the wife permanently his society and protection, and to withhold from her the means necessary for her support.*

A decree for maintenance is but an incident to one for a separation, and the circumstances under which such a decree (*i. e.,* for maintenance) may be made, must be of such a nature as would in themselves justify a direction of a separation.

*Special Term, January,* 1880.

ACTION for separation from bed and board, for alleged cruelty and abandonment.

*Jacob F. Miller* (with him *Mr. Jacob Weart* of the New Jersey bar), for plaintiff.

*C. P. Hoffman*, of Nyack (with him *Mr. R. Allen, Jr.*, of the New Jersey bar), for defendant.

BARRETT, *J.*—The law applicable to this class of cases is reasonably well settled. To entitle a wife to a divorce *a mensa et thoro* under the first and second subdivisions of the statute (2 *R. S.*, 147, *sec.* 51), there must either be actual violence or a reasonable apprehension of bodily injury. Wounded susceptibilities do not suffice for so grave and momentous a judgment as we are called upon to pronounce. Occasional outbursts of passion will not do; nor mere abuse, however gross. Words of menace, however, are sufficient if they be of such a character and accompanied by such circumstances as to justify a belief in their seriousness. That is, they must impress the person to whom they are addressed, not as idle words, not as a form of intemperate expression, but as importing action, and in that sense conveying the reality of a threat of bodily harm. The authorities in support of the rule, as thus summed up, are so numerous that it will only be necessary to cite a few of the more prominent cases in our own State (*Perry* agt. *Perry*, 2 *Paige*, 501; *Burr* agt. *Burr*, 10 *id.*, 31, 32, 33; *Mason* agt. *Mason*, 1 *Edw. Ch.*, 278; *Whispell* agt. *Whispell*, 4 *Barb.*, 217; *Davies* agt. *Davies*, 55 *Barb.*, 133; *Davis* agt. *Davis*, 1 *Hun*, 444; *Kennedy* agt. *Kennedy*, 73 *N. Y.*, 369).

Jeopardy to health also comes within the rule. This, however, need only be mentioned in passing, because, although there was a suggestion on that head during the trial, the evidence wholly fails to show any special or marked physical change in the plaintiff, or the likelihood of any.

Upon the main question, we are of opinion that the present plaintiff entirely fails to make out a case within the rules which have been stated. Words in form threatening were

certainly uttered. But upon a patient and thoughtful review of the entire evidence, we are fully satisfied that the language used was a mere exhibition of coarse and vulgar passion; that the defendant never for a moment contemplated physical violence, and we feel bound to add, that the plaintiff never believed herself to be in the slightest jeopardy. Without attempting the painful and really unprofitable task of stating and analyzing the testimony in detail, it will suffice to point out certain prominent and substantially undisputed features of the case which lead us to this conclusion.

The parties, though unrefined and illiterate, seem to be very decent and worthy sort of people. They managed to get along with rather more than average felicity (we had almost said, in view of the prevalence of divorce cases in our courts, with rather less than average infelicity) until Mr. Ruckman became possessed of what, from the entire absence of legal evidence, must be called an unhappy delusion as to his wife's infidelity. At this point, it is to be observed that the defendant was not generally violent. Indeed, all the witnesses agree that he was a man of kind heart, charitable disposition and generous impulses. No one who needed help was ever turned empty-handed from his door. He was gentle and considerate to his domestics. His wife had every thing that she desired; a comfortable home, horses, carriage, jewelry, and clothing fully adequate to her position. She, too, seems to have been highly respected; a good friend, a pleasant neighbor and an excellent wife. Such facts as these are properly to be considered (*Barrere* agt. *Barrere*, 4 *John. Chy.*, 189).

There were two distinct epochs of passion; one before Mrs. Ruckman went to her father's; the other after her return home. The former is made up of more numerous incidents than the latter. Indeed, that which immediately preceded the final separation was but an isolated outburst. Even the first, however, was not continuous. These sallies of passion were fitful and occasional. They were not put forward in

Ruckman agt. Ruckman.

bad faith for ulterior purposes, but were unfortunately the result of deep, though mistaken, conviction. If Mr. Ruckman, after the first exhibition of feeling, had found his wife in Haring's company, he might possibly have been unable to control himself. But Mrs. Ruckman was too good a woman to associate with a person who, even without cause, had become thus objectionable to her husband, and so long as she conducted herself in that creditable manner, she had nothing to fear. It cannot be overlooked, that the defendant, even in his worst moments, never raised a finger against her. Under such circumstances, and in view of such personal characteristics, it is impossible to believe that the occasional expressions, in the form of threats, which we find mixed in as it were with the abusive epithets, had any independent vitality as words of menace. They were simply part and parcel of the defendant's wild and chaotic speech. That the plaintiff so believed, is entirely clear from her own actions. She always slept with the defendant, never sought a separate bed-room, never shut or locked herself in anywhere, and never asked any assistance, or intimated that she might need it. Then her letters, written between the two periods, are quite conclusive. In these she speaks to the defendant most affectionately, constantly requesting him to come and see her, declaring that "no matter what people say to her, *she knows how good he has been,*" blessing him, and by many other expressions indicating the fallacy of her present theory that she believed him capable of the brutality contemplated by the law. The effect of these letters cannot be removed by saying that they were written as a matter of Christian duty. To win a man back by hypocrisy and falsehood is a strange view of Christian duty. But the letters, on their face, seem to protest against the character thus assigned to them. They are clearly the spontaneous and heartfelt utterances of a true and loyal woman, eager to resume her matrimonial relations, and in whose breast lurked no sense of past, present, or prospective danger.

When she returned to her home, months elapsed without a

Ruckman agt. Ruckman.

single recurrence of trouble. During this period of repose Haring died, and with him all cause of unhappiness seemed to have been buried. But at length there was an acrimonious scene upon another subject, and then, by way of recrimination, the old suspicion was revived and flung at the plaintiff in a most improper and indecent manner. But it is absurd to talk of violence, or apprehension of violence, in this connection. If nothing of the kind was contemplated or apprehended during Haring's lifetime, how exceedingly remote was such a contingency months after his death. And, further, when we reflect, that from that time until her departure, some ten days later, Mrs. Ruckman slept securely, if not peacefully, by Mr. Ruckman's side every night; that nothing further occurred to disturb their tranquility; that she sought legal advice in the *interim*, and finally left her home in the company, with the assistance, and under the protection of her husband, the conclusion is irresistible.

She may have left solely because unwilling to put up with further indignity, or she may have been advised that the assertion of her womanhood need not jeopardize her pecuniary and property interests. What may be confidently asserted, however, is that she *did not* leave because of apprehended violence.

The charge of abandonment is equally untenable. It was the lady who voluntarily left her husband's home. That home has always been open to her. Mr. Ruckman begged her to remain, has since entreated her to return, has urged others to do likewise, *has legally bound himself, for her support* (a fact which, of itself, seems to be conclusive [2 *R. S.*, *page* 147, *sec.* 51, *sub.* 3]), and has furnished her with $100 in money.

No demand for further means was ever made upon him. Instead of that, came the present suit and other harassing litigations, seeking the recovery of considerable property.

We are satisfied that the defendant's efforts to induce the plaintiff to remain, and subsequently to bring her back, were

made in good faith ; not for the purpose of avoiding a separate maintenance, nor to elude the justice of the courts. He had, it is true, declared in his passion that she must leave. But he no more intended that, and she no more believed that he did, than he intended or she apprehended physical injury.

This branch of the case is not nearly as strong as *Barlow* agt. *Barlow* (2 *Abb.* [*N. S.*], 259), where it was held that the actual expulsion of the wife on an accusation of unfaithfulness, was not, under the circumstances, sufficient to sustain the charge of abandonment. " Regarding the marriage contract as stable and sacred," says the court in that case, " our law does not favor separations between husband and wife, and to justify a judgment for limited divorce on the ground of abandonment, such circumstance must appear as manifest *a settled and determined purpose in the husband to withdraw from the wife permanently his society and protection, and to withhold from her the means necessary for her support*" (*See, also, Atwater* agt. *Atwater*, 53 *Barb.*, 621, *and Ahrenfelds* agt. *Ahrenfelds*, 1 *Hoffm. Chy.*, 47).

As to the claim for a separate maintenance, independent of a decree of separation, it is only necessary to refer to *Douglas* agt. *Douglas* (5 *Hun*, 140). It was there distinctly held by the general term in this department (*citing P.* agt. *P.*, 24 *How. Pr.*, 197 ; *Davis* agt. *Davis, and Atwater* agt *Atwater, ubi supra*), that a decree for maintenance is but an incident to one for a separation, and that the circumstances under which such a decree (*i. e.*, for maintenance) may be made must be of such a nature as would, in themselves, justify a direction of a separation. The reasons for this construction of the statute (2 *R. S.*, 147, *sec.* 58) are fully assigned, and need not be here restated.

It follows that the defendant is entitled to judgment, dismissing the complaint upon the merits.