Wallace, J.
The plaintiff having recovered a verdict for $10,000 for breach of contract of marriage, the defendant now moves for a new trial, alleging error in the rulings upon the trial.
The plaintiff is a half sister of the defendant’s mother. She was temporarily residing at Mobile, Alabama, which was the domicil of the defendant, when the marriage engagement took place. Subsequently plaintiff returned to the State of New York. The evidence authorized the jury to find that at the time of the engagement to marry, the parties did not contemplate an early marriage; that it was not until after the plaintiff had removed to the State of New York, that any definite plan as to the time or place of the marriage was entertained ; and that then it was contemplated that the parties should be married at some convenient future time, in the State of New York. No question was raised upon the trial of an intent to marry in New York for the purpose of evading the laws of Alabama.
By the statutes of Alabama, marriage between the son and the sister of his mother is declared to be incestuous and void, and such persons who marry or who cohabit together are declared guilty of crime and punishable by imprisonment. By the statutes of New York, marriages between parents and children, including grandparents and grandchildren of every degree, ascending and descending, and between brothers and sisters of the half, as well as of the whole blood, are declared to be incestuous and absolutely void.
The jury were instructed that while the parties could not lawfully contract marriage in the State of Alabama, and the promises for such a marriage would be void, they could lawfully marry in the State of New York ; and if By the terms of their promises of marriage the promises were to be fulfilled by a marriage in New York, the agreement was valid, and plaint *365 iff upon proving a breach could recover damages. If this instruction was erroneous, the motion for a new trial must prevail.
This ruling involves several novel questions of law which could not be satisfactorily considered upon the trial. Some of these questions arise under that difficult and perplexing branch of jurisprudence which relates to the conflict of laws of different States, as to which it was well remarked by Porter, J., in Saul v. His creditors (17 Mart. La. 570): “ Our former experience has taught us that questions of this kind are the most embarrassing and difficult of decision that can occupy the attention’of those who preside in courts of justice.”
The first question which the instructions present is whether the agreement of the parties is controlled by the law of Alabama or by that of New York. As the statute of Alabama declares a marriage between persons related as are the parties void and criminal, if the law of Alabama controls, no agreement having such a marriage as its consideration can be enforced. The ruling upon the trial proceeded upon the theory that the agreement was governed by the law of New York, because the promises were to be fulfilled in New York.
It would seem that the question whether the validity of a contract, made in one place and to be performed in another, is to be determined by the law of the place where the contract is made or by the law of the place of performance,could not at this day be a doubtful or open one. There is certainly very high authority to sustain the ruling on the trial. In Story’s Conflict of Laws (§ 242), the rule is stated thus : “ Generally speaking, the validity of the contract is to be decided by the law of the place where it is made, unless it is to be performed in another country ; for, as we shall presently see, in the latter case the law of the place of performance is to govern.” Again, the learned author says, *366 “ the rules already considered suppose that the performance of the contract is to be in the place where it is made, either expressly or by tacit implication. But when the contract is either expressly or tacitly to be performed in any other place, then the general rule is in conformity with the presumed intention of the parties, that the contract as to its validity, nature, obligation, and interpretation is to be governed by the law of the place of performance” (Conflict of Laws, § 280). In Andrews v. Pond (13 Peters, 65), the doctrine is briefly stated thus : “ The general principle in relation to contracts made in one place to be executed at another is well settled. They are governed by the laws of the place of performance.”
On the other hand, the rule is laid down in a very recent case as follows : “ Matters bearing upon the execution, the interpretation and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with the performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitations, depend upon the law of the place where suit is brought” (Scudder v. Union National Bank, 1 Otto, 406). The question in that case was whether a parol promise made in Illinois to accept a bill payable in Missouri was a contract governed by the law of Illinois or Missouri ; and it was held, to be an Illinois contract, and governed by the law of that State. The court say: “The contract to pay the bill was a different contract from that of acceptance.”
The parol promise being valid by the law of Illinois was valid everywhere. This was all it was necessary to decide, and while the statement of the general principles of the law relative to contracts made in one State .to be performed in another, is entitled to great respect from the high authority of the court from which it was *367 enunciated, it is not controlling upon the present question, and will be found quite inadequate in its application to a great variety of cases which present questions of the conflict of laws. So far as the validity of a contract depends upon the formalities requisite to its binding force, "the general rule expressed by the text writers is that the test deponds upon the law of the place where the contract is made (Westlake, § 175). An illustration is the case of an unstamped contract made in a country where a stamp is required. Even in this case the authorities conflict, and Judge Stoey says it might be different if the contract were payable in another country where no stamp is required (see Story Conjl. L. § 260 and notes). Wharton (Confl. L. § 401) states the general rule thus: “Obligations in respect to their mode of solemnization are subject to the locus regit actum,.” The validity of a contract may depend upon the capacity of the parties, or the forms of authentication, or the nature of the consideration ; and it certainly cannot be accepted as an universal criterion that the validity or invalidity of a contract is to be determined by the law of the place where the contract is made.
As respects the capacity of parties, the law of domicil may dominate the law of the place of the contract when rights of person, as distinct from rights of property, are concerned (see 2 Parsons on Contracts, 5 ed. 572, 574 and notes), and as respects the consideration matter a contract may be invalid by the law- of the place of the making, because prohibited by the local law, and yet be valid when to be performed in another place or where brought in question elsewhere. In disposing of the many vexed questions that arise under the qualifications of the general rules, the courts are frequently obliged to fall back upon the principle that only such claims will be regarded as having a legal *368 foundation as are maintainable in the place where the suit is brought (Wharton, § 401 [o]).
In the present case the question arises whether the validity of the contract, as respects the capacity of the parties to it, depends upon the law of Alabama, wdiere the contract was made, or of New York, where it was to be performed. Although the laws of Alabama do not in terms incapacitate persons related as are these parties from agreeing to marry each other, the statute does incapacitate them from contracting the marriage relation. Neither party could acquire any rights or be subjected to any liabilities by the agreement because of the statutory disability. To all intents and purposes the agreement was void because of the disability of the parties, by the laws of Alabama, unless it is saved because it was to be performed in New York.
As to the capacity of parties to enter into a contract, it must be accepted as the general rule that the law of the place where the contract is made must be the test (Story Confl. L. § 103). The right of every State to prescribe the conditions which determine the personal status of its own citizens is unquestioned (1 Burge Col. & For. Laws, 196). But the most contradictory opinions prevail as to the extra-territorial operation of these conditions. By some of the authorities it is held that when a statute of domicil confers, abridges or destroys capacity, whether this capacity be generally for the possession of rights or specially for the exercise of business, then such status attaches to the subject wherever he may stray, and is to be regarded as conclusive by all foreign courts (Wharton, §§ 81, 92; Parsons Cont. 5 ed. 572 ; Story, § 65). But the result of the English and American authorities is to the contrary, and the incapacity of the domicil of the party is not permitted to shield him from obligations which he could otherwise lawfully assume at the place where *369 they are incurred (Story Confl. L. §§ 101, 102 ; Wharton, § 115).
That this contrariety of opinion still exists, is shown by a very recent case in England (Sottomeyer v. De Barros*), decided by the high court of justice, in which Sir James Hammett takes occasion to criticise the views expressed by the lord justices in the court of appeal in the same case upon an appeal from the decision of Sir R. Phillimobe. Sir James Hammem says : “ The lords justices appear to have laid down as a principle of law a proposition which was much wider in its terms than was necessary for the. determination of the case before them. It is there expressed : It is a well recognized principle of law, that the question of personal incapacity to enter into any contract is to be decided by the law of domicil.’ And again: ‘As in other contracts, so in that of marriage, personal capacity must depend on the law of domicil.’ It is, of course, competent for the court of appeal to lay down a principle which, if it forms the basis of the judgment of that court, must, unless it be disclaimed by the house of lords, be binding on all future cases. But I trust I may be permitted, without disrespect, to say that the principle thus laid down has not hitherto been “well recognized.” On the contrary, it appears to me to be a novel principle, for which, up to the present time, there has been no English authority. What authority there is seems to be distinctly the other way. This is the case of Meade v. Roberts (3 Exch. 183). The contract on which defendant was sued was made in Scotland. The defense was that the defendant was an infant ; but Lord Eldom held the defense bad, saying: “If the law of Scotland is that such a contract as the *370 present could not be enforced against an infant, it should have been given in evidence. The law of the country where the contract arose must govern the contract.” Sir E. Simpson, in the case of Scrimshire v. Scrimshire (2 Cons. 395), when dealing with the subject says : “ These authorities show that all contracts are to be considered according to the laws of the country where they are made, and the practice of civilized countries has been conformable to this doctrine, and by the common consent of nations has been so received.” This is the view of the subject which is expressed by Btjrg-e (vol. 1, § 4,132) and by Story (Confl. L. § 103); and Sir C. Cresswell in Simonin v. Mallac (2 S. & Tr. W. 67) says: “ In contracts, the personal competency of individuals to contract has been held to depend on the law of the place where the contract was made.” If the English reports do not furnish more authority on the point, it may, as Mr. Westlake has said, in his work on Private International Law, be referred to its not having been questioned. In the American reports, the authorities are numerous, and uniformly support Sir C. Cresswell’s statement of the law which I have quoted. I cannot but think, therefore, that the learned lords justices would not desire to base their judgment on so wide a proposition as that which they have laid down with reference to the personal capacity to enter into all contracts” (20 Alb. L. J. No. 23, p. 450).*
Upon principle no reason can be alleged why a contract void for want of capacity of the party at the place where it is made should be held good because it provides that it shall be performed elsewhere, and nothing can be found in any adjudication or text-book to support such a conclusion. It is-a solecism to speak of that transaction as a contract which cannot be a con • tract because of the inability of the persons to make it such.
*371 When the authorities which declare that the obligation, interpretation, nature and validity of a contract-made in one place, which is to be performed in another, are to be determined by the law of the place of performance, are examined, it will be found that the term validity refers to the conditions of the contract and the extent and nature of its obligation, as to which the agreement will be upheld or defeated according to the sanctions or the prohibitions of the law of the place where the parties have located the transaction.
But if it should be conceded that the law of the place of performance of the contract is the law which determines its validity in all respects, the question then arises whether the place of performance of an agreement to marry is the place where the marriage is to be solemnized, or whether it is not that place where the parties are to reside and discharge their marital relations. The instructions on the trial assumed that the place of solemnization was the place of performance.
The word marriage is used in two different senses ; the one denoting the act of entering into the marriage relation ; the other the relation itself. In the latter sense it is defined as the civil status of one man and one woman united in law for life under the obligation to discharge to each other and to the community those duties which the community by its laws imposes (1 Bishop on Mar. & D. § 3).
The general rulé is undoubtedly that a marriage good by the law of the place of solemnization is good everywhere.
It is unnecessary to refer to the exceptions, such as polygamous or incestuous marriages. The rule rests upon considerations of policy. “Infinite mischief must necessarily arise to the subjects of all nations with respect to legitimacy, successions, and other rights, if the respective laws of different countries were only to be observed as to marriages contracted by the *372 subjects of those countries abroad; and therefore all nations have consented, or are presumed to consent, for the common benefit and advantage, that such marriages shall be good or not, according to the laws of the country where they are celebrated. By observing this rule, few, if any, inconveniences, can arise. By disregarding it infinite mischiefs may ensue” (Scrimshire v. Scrimshire, 2 Hagg. Consist. 417, 418).
The question here .is not whether the place of solemnization of a marriage controls the status of the parties, but whether the place of solemnization is the place of performance of an agreement to marry. The promise is to enter into a relation to which the State where the parties are to be domiciled can attach its own conditions, both as to the creation and duration of the relation. If the parties here contemplated making Alabama their domicil, their promise to marry could not be substantially fulfilled without ’abandoning their intention, because in Alabama they would have been not only social outlaws, but criminals.
It cannot be said that the domicil which the parties to an agreement of marriage contemplate, is not one of the material elements of the transaction in view. On the contrary, it is of the very essence of the contract. And when it is found that the parties cannot enter into the marriage relation without expatriating themselves, it would seem that either party would be justified in receding from the arrangement. It is, therefore, the most reasonable conclusion that the place where the parties are to be domiciled is the place of performance of the marriage contract, both because the substantial consequences of the act to be performed are fixed by the law of the domicil, and because the presumed intention of the parties to the agreement cannot otherwise be effectuated.
It will thus be seen that whether the validity of the agreement depends upon the law of the place where *373 the contract was made, or that of the place where it was to be performed, the ruling at the trial cannot be upheld.
If these conclusions are correct, it is unnecessary to decide, whether or not an agreement to marry, between persons related, as are the parties, is one which will be enforced by the law of this State. But as this point has been fully argued by counsel, and will quite probably require decision upon another trial, in view of some of the evidence offered on the former trial, it is proper that it be considered now.
It is insisted for the defendant that if the agreement between the parties is a New York contract, yet it cannot be enforced, first, because a marriage between the parties would have been a voidable marriage, which either party could procure to be annulled at any time during the lives of both ; and second, if the marriage would not have been a voidable one, an agreement to marry between persons related as are the parties, is contrary to public policy, because offensive to decency and the purity of domestic life, and therefore will not be enforced.
The case is to be considered as though the parties were nephew and aunt; as relatives of the half blood are, equally with those of the whole blood, included in those degrees of consanguinity within which marriages are deemed incestuous (Horner v. Horner, 1 Hagg. Cons. 353; Queen v. Brighton, 1 Ell., B. & S. 447; S. C., Regina v. Brighton, 1 B. & S. 447; People v. Jennors, 5 Mich. 318; 1 Bishop Mar. & D. § 317). Marriages between persons in the direct lineal line of consanguinity and between brothers and sisters in the collateral line, are incestuous and void as against the law of nature (Sutton v. Warren, 10 Met. 451; Hiram v. Pierce, 45 Me. 367; Wightman v. Wightman, 4 Johns. Ch. 343). In the last cited case, Chancellor Kent expressed the opinion that in the absence of legislation it could not *374 be maintained that marriages between persons of a remote degree of consanguinity can be declared void.
A marriage between nephew and aunt was prohibited by the canon law of England, and this prohibition was incorporated into various statutes of Henry VIII., and the distinction between void and voidable marriages has become crystallized into the later law of England. Such marriages, while not void, were voidable by the sentence of the ecclesiastical courts pronounced during the lifetime of both parties.
Whether this distinction has ever obtained in our own country is an open question, but that it has never obtained in this State is authoritatively settled.
The commentators recognized it as a part of the body of law brought to the colonies by our ancestors, and adopted by us ; but in Burtis v. Burtis (1 Hopk. 557), the question was examined by the chancellor, in the light of the provincial history of New York, and he concluded that the law of England concerning divorces and matrimonial causes was never adopted in the colony of New York in fact or practice, and was never the law of the colony, and that the statutes of the State were clearly original regulations intended to authorize divorces in cases in which no divorce could before be obtained, and he says: “to consider them as an adoption of the English law of divorces, would be a violent perversion of the language and intention of the legislature.” This case is followed by Palmer v. Palmer (1 Paige, 276), to the effect that the court of chancery had no power to decree a dissolution of the marriage contract except in the special cases provided for by statute, and has never been questioned by the courts of this State (see also Perry v. Perry, 2 Paige, 501). It must be held, therefore, that the consanguinity of the parties would not render their marriage a voidable marriage in this State. But it by no means follows that an agreement to marry, between persons *375 thus related, will be tolerated. It is one thing to adjudge that after marriage the consanguinity of the parties cannot be invoked to annul the marriage, and quite another to decide whether an agreement for marriage between persons so nearly related should be sanctioned. In the one case the bastardizing of the issue and the unsettling of successions would furnish decisive reasons why the marriage should not be annulled. When the parties have not consummated their agreement, these reasons cannot apply.
Notwithstanding the extensive research of counsel, no case has been found which determines whether an agreement for a marriage between a nephew and aunt is obnoxious as contravening morality or public policy. Such marriages are expressly prohibited by the civil law, by the laws' of England, and by the statutes of many of our own States. Where such marriages are prohibited, the question would not arise, because it would not be attempted to recover damages for the breach of an unlawful contract. And it is not improbable that the question has not been presented to the courts of the States where thex’e is no statutory prohibition, because such marriages are felt to be so unnatural and revolting that, they have been very rare, and bixt few pei’sons have been found^willing to contemplate such a union. The pecxxliar circumstances of the present case went far to justify the jury in an attempt to punish the defendant. He was a man of education, a physician of prominence, many years the senior of the plaintiff, and having overcome her scruples against the engagement, held her to her promise until she had lost her youth and health, and sacrificed her prospects in life ; and the jury doubtless were satisfied that she brought this action rather to punish him for his selfish and dishonorable treatment, than to obtain pecuniary recompense for her own injury. These considerations, of course, can have no influence *376 here, and her case must stand or fall by the inflexible rules which, while they may be harsh in the particular case, are nevertheless the universal test.
The fact that marriages between persons so related are so commonly prohibited by legislation in those communities, which are among the most advanced in moral and intellectual progress, must be deemed high evidence of the generally prevailing public sentiment on the subject. Whether this sentiment finds Its origin in the mandate of divine law, .or the belief that such unions are a violation of the physical laws of nature, or in the conviction that to tolerate such alliances would impair the peace of families, and lead to domestic licentiousness, its existence must be acknowledged and traced to some or all of these sources.
The statutes of Henry VIII., prohibiting such marriages, are but a reaffirmation of the Levitical law (Regina v. Chadwick, 12 Eng. Jurist, 174). While the Levitical law is not binding as a rule of municipal obedience, it has been judicially declared to be a moral prohibition, and as such binding upon all mankind (Harrison v. Bushwell, 2 Vent. 9), and is mow incorporated into the statutes of England by the acts of 5 and 6 William IV., c. 54. In Illinois it is held that such a marriage “is prohibited by the laws of Grod,” within the meaning of a statute of that State (Bonham v. Badgley, 2 Gilm. 622). In Parker’s Appeal (44 Penn. St. 309, 312), the court, while holding that such a marriage was not void under the laws of Pennsylvania, took occasion to say, “ we cannot refrain from stating that such connections are destructive of good morals, and should be frowned upon by the community.” Between what degrees of consanguinity the line is to be found which determines what marriages are unobjectionable, and what are not to be tolerated, it is not necessary to decide ; but the better opinion would seem to be that marriages should not be sanctioned in any nearer de *377 gree than that of cousin,s german. A marriage between uncle and niece, or nephew and aunt, would certainly shock the sentiment of any enlightened community, and this, in the absence of any other test of the propriety or decency of things, should be accepted as controlling. It can hardly be doubted that if the parties here had become husband and wife, they would have been regarded as joined in an unnatural union, and, as victims of a corrupted moral taste, to be pitied and avoided, if not as objects of detestation. And in this view the plaintiff may consider herself fortunate that she has been saved from such a future, by the selfish and perfidious conduct of the defendant.
A new trial is granted.

 27 Weekly Rep. 917; see also Harvey (otherwise Farnie) v. Farnie, P. D. & A. Div. 724; L. R. 5 P. D. 153; 49 L. J. P. D. & A. 33; 42 L. T. 482.

 S. C., 27 Weekly Rep. 917.