SOPHIA E. HIGBEE, APPELLANT, v. LUCY M. HIGBEE, RESPONDENT.

LEGISLATIVE DIVORCES.—The legislature of the territory of Idaho, while one Lyman P. Higbee was a member thereof, passed an act dissolving the marriage between said Higbee and appellant, which was without notice to appellant, and while the territory of Idaho had a general law on the subject of divorce. *Held*, that the granting of such divorce was not a rightful subject of legislation under § 1851, Revised Stat., U. S.

APPEAL from a judgment of the district court of the first district. The opinion states the facts.

*Mr. J. G. Sutherland* (*Mr. J. R. McBride* and *Mr. H. O. W. Margery*, with him), for appellant.

*It is not within the competence of a legislature, by the exercise of mere legislative power, to grant a divorce.*

The passage of such an act by the forms of legislation is not the exercise of legislative power.

The organic act vested in this territorial legislature legislative power, extending "to all rightful subjects of legislation." The limitations which affect the power of legislative bodies in the territories, and all legislative bodies under the operation of the guaranties contained in the Federal Constitution, will be discussed further on. Now, we contend that the passing of this act was not legislation; that it is an abortive act of despotism—not a law.

A law is defined to be a rule of civil conduct. A statute law is such a rule prescribed by the supreme power of the state. It is a rule of conduct or action formulated for subsequent observance.

The legislature of Idaho, in 1864, by the proper exercise of its law-making power, had enacted a divorce statute. This section confers jurisdiction on the courts to grant divorce for cause:

"Divorces from the bonds of matrimony may be obtained by complaint under oath to the district court of the county

in which the cause therefor shall have accrued, or in which the defendant shall reside, if the latter be within the county in which the parties last cohabited, or in which the plaintiff shall have resided six months before suit be brought, for the following causes: First—Impotency at the time of marriage, continuing to the time of divorce; Second—Adultery since the marriage, remaining unforgiven; Third—Wilful desertion of either party by the other for the space of two years; Fourth—Conviction of felony or infamous crimes; Fifth—Habitual, gross drunkenness, contracted since marriage, of either party, which shall incapacitate such party from contributing his or her share to the support of the family; Sixth—Extreme cruelty in either party; Seventh—Neglect of the husband for the period of two years to provide the common necessaries of life, when such neglect is not the result of poverty on the part of the husband which he could not avoid by ordinary industry."

The legislature of that territory possessed no judicial power. By the organic act that power was vested in the court. The three great powers of goverment—judicial, legislative and executive—were confided to three separate and distinct branches of the territorial establishment. They were delegated powers, and each department could exercise that power which was granted to it, and no other: *National Bank* v. *Yankton,* 101 U. S. 101; *Territory* v. *Lee,* 2 Mont. 124; *Kilbourn* v. *Thompson,* 103 U. S. 168; *Chandler* v. *Nash,* 5 Mich. 409; *C. W., etc., R. R. Co.* v. *Commissioners,* 1 Ohio St. 87; *People* v. *Draper,* 15 N. Y. 543; *State* v. *Maynard,* 14 Ill. 420; *Greenough* v. *Greenough,* 11 Pa. St. 487; Whart. Com. on Law, § 388; Cooley's Const. Lim., 106, et seq.

This divorce act is a *judgment,* though not pronounced by a *court.* It professes to give practical relief. If it can not be sustained as a judgment, it is not therefore a law. It obviously can not be sustained as a judgment. It could be rendered only by a tribunal having judicial power, and the Idaho legislature had none. There were wanting two essential constituents of a court—there was no *judex*—no *reus.* The validity of this judgment must be tested like

the validity of any other judicial record.    It declares no law, and, hence, must be supposed to be made with refer-. ence to the law which a court rendering a similar judgment would judicially take notice of and follow.    When a judgment is rendered the law in force must warrant that determination, and that law must authorize its rendition by the tribunal which pronounces it; otherwise it will be void. When rendered on a subject matter not within the jurisdiction of the tribunal, it is void on its face.

As this judgment is rendered by a legislative body, having no judicial authority whatever, there is plainly manifest on its face this fatal defect and want of jurisdiction: *Barthelemy* v. *Johnson,* 3 B. Mon. 91; Marshall, C. J., in *Gaines* v. *Gaines,* 9 B. Mon. 295; Kent, Ch. J., in *Dash* v. *Van Kleeck,* 7 John 508; *Irving's Appeal,* 16 Pa. St. 266; *Lewis* v. *Webb,* 3 Greenlf. 326; *Dunham* v. *Lewiston,* 4 Greenlf. 140; *Holden* v. *James,* 11 Mass. 396; *Piquet, Appellant,* 5 Pick. 64; *Simonds* v. *Simonds,* 103 Mass. 572; *White* v. *White,* 105 Id. 325; *People* v. *Frisbie,* 26 Cal. 135; *Wallysheim* v. *Kennedy,* 2 Yerg. 554; *Clark* v. *Clark,* 10 N. H. 387.

Under the operation of these principles what would be the effect of a statute which in terms should prescribe that A and B, who were eligible by the general law to intermarry, should not do so, and that the marriage, if they should have it solemnized, should be void?    Would such an invidious and exceptional statute be sustained?    Under the elementary definition of municipal law, which has been given, and the adjudications which have been cited, such a statute would be held void.    It would be held not to be legitimate legislation.    An arbitrary act, annulling a lawful marriage, which, by the general law could not be dissolved, would be of the same exceptional character, and obnoxious to the same objection.    Those who make the laws "are to govern by promulgated, established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and for the countryman at plough:"  Locke on Civil Government, § 142; *Ward* v. *Barnard,* 1 Aik. 121; *Town of Bradford* v. *Brooks,* 2 Id. 284; *Kendall* v. *Dodge,* 3 Vt. 360; *Starr* v. *Robinson,*

1 Chip. 257; *Bales* v. *Kimball*, 2 Id. 77; *Bank* v. *Cooper*, 2 Yerg. 599; *Durkee* v. *Janesville*, 28 Wis. 564; *in the matter of Nichols*, 8 R. I. 50; Cooley's Const. Lim. 118, 129, 488.

*This divorce act is void for violating the petitioner's constitutional rights.*

The petitioner and the deceased having been lawfully married, she had a right to her husband, and there was vested in her other marital rights, which the law recognizes. In respect to them, she was entitled, with all others, to "the equal protection of the laws." She could not be deprived of them, except by "due process of law;" and she was entitled to be exempt from deprivation of any *ex post facto* law, or any law impairing the obligation of the marriage contract. The divorce act in question would infringe her rights in these several ways.

Marriage is pecuniarily and otherwise valuable; the promise of marriage and actual marriage are so. A loss of it by breach of the promise gives a right to damages. These are measured by the value of the advantages which would have accrued if the contract had been fulfilled. In such an action, the jury may take into consideration the money value or worldly advantages, separate from considerations of sentiment and affection, of the marriage; and if the affections of the plaintiff were in fact implicated, the injury to her affections may be considered as an additional element of damages: *Harrison* v. *Swift*, 13 Allen 144.

Marriage is a valuable consideration like money to support a contract or conveyance: *Whilan* v. *Whilan*, 3 Cow. 53; *Smith* v. *Allen*, 5 Allen 454; *Maquiac* v. *Thompson*, 7 Pet. 348; *Slerry* v. *Arden*, 1 Johns. Ch. 271.

Wife has a vested right under the marriage contract.

Well considered cases in the states have proceeded on the ground that marriage is a contract, within this provision of the constitution, and that under it rights become vested which can not be disturbed by subsequent legislation: *Lawrence* v. *Miller*, 2 N. Y. 245; *Westervill* v. *Gregg*, 12 Id. 202; *Holmes* v. *Holmes*, 4 Barb. 295; *Jackson* v. *Sublett*, 10 B. Mon. 467; *Dunn* v. *Sargent*, 101 Mass. 336;

*Gardner* v. *Hooper*, 3 Gray 398; Cooley's Const. Lim. 447;
*State* v. *Fry*, 4 Mo. 183; *Ponder* v. *Graham*, 4 Flor. 23.

The marriage contract gives each of the parties a right
to the person of the other for their mutual happiness, and
the production and education of children:   1 Rutherford's
Inst. 214; 2 Id. 335.

Every legislative divorce granted in this county that has
been upheld by the courts was  judicial, except one.

There is one case which holds a legislative divorce to be
valid.   It is *Maynard* v. *Valentine*, 1 West Coast Rep. 840,
decided in Washington Territory, in 1880.   It was a case
as destitute of merit for a divorce as was that of the
deceased for a divorce from the petitioner.   Notwithstand-
ing the gross injustice done to the wife, the court answered
affirmatively the question of the validity of the legislative
divorces, conceding that it disposed of her dearest interests,
in her absence, without her knowledge, against her will,
and without inquiry.   It will be noticed in this decision
that there was a singular obfuscation respecting the dis-
tinctive functions of the legislative and judicial depart-
ments of the government.   First, the sovereign will is
paramount against which no private rights can contend or
stand out.   Second, the legislative branch is the organ of
this sovereign will, and unchecked by a constitution, has
the omnipotence of parliament, not only to pass laws, but
mould "all persons and things, and each particular person
and thing, conclusively to what it says, determining abso-
lutely and finally every question by its fiat."   It affirms
that "British parliamentary divorces, which are indis-
putably legislative divorces," are examples, that all positive,
"spontaneous" and aggressive action of the sovereign will,
is legislative; and only the response of a passive tribunal
incapable of acting unless petitioned, is judicial; and,
third, that though there is a radical distinction between
the legislative and judicial bodies, it is not a dissimilarity
of process, procedure or results attained.   The distinction
"consists in the deep seated organic relations which court
and legislature respectively bear to the central sovereignty
which speaks and acts through them."   In short, it consists
in the *passiveness* of the *judicial*, and the aggressiveness

and spontaneity of *legislative* power. They may separately act to accomplish the same ends, with only this difference: the legislature may act on its own motion, but a court only on petition. Here, however, the parallel ends; the court must apply the law; the legislature is a law unto itself, and may produce a like result or any result in any way it pleases; it "may consume property, obliterate contracts, or destroy life."

Upon this basis and theory, the court interprets the grant of legislative power of the territories—the scope of "*all rightful subjects of legislation*;" holds it to mean, "subjects already defined by the general consent and practice of the people who in congress have mentioned them." "From these," say the court, "we gather that the people of the United States, at the date of the organic act, thought and still think, individual marriages to be the subjects of legislation, and legislative divorces valid, unless there be some express constitutional provision to the contrary. This seems to us conclusively to establish the proposition, that the territorial legislature, in passing this special act of divorce, was acting upon a subject which, within the sense of the organic act, was a rightful subject of legislation."

We submit that a conclusion based on such premises can not safely be followed as a precedent.

*Mr. Ransford Smith,* for respondent.

This question is settled in Utah: *Whitman* v. *Harden,* 1 West Coast Rep. 424; see also *Maynard* v. *Valentine,* 1 West Coast Rep. 840.

An act of the legislature divorcing husband and wife, acquiesced in by both parties, is not an exercise of judicial authority: *Caball* v. *Caball,* 1 Metc., Ky., p. 319.

The act divorcing the parties from the bond of marriage is a constitutional act of legislative authority: *Wright* v. *Wright,* 2 Md. 429, sec. 3688.

If a legislature dissolve a marriage contract, the presumption is that it acted upon sufficient cause shown: *Cromise* v. *Cromise,* 54 Penn., St. 255.

A divorce by act of the legislature is valid in a case

of which the court, under existing laws, has no jurisdiction: *Adams* v. *Palmer*, 51 Me. 480. See also *Jones* v. *Jones*, 12 Pa. St. 350; *Starr* v. *Pease*, 8 Conn. 541; *Guilford* v. *Oxford*, 9 Conn. 321; 48 Am. Dec. note, p. 438; *Crane* v. *McGinnis*, 1 Gill & Johnson, Md., 463; 19 Am. Dec. 237; *Fornshill* v. *Murray*, 1 Bland Ch., Md., 479; 18 Am. Dec. 344.

It is now settled that marriage is not a contract, but a status, and therefore does not come under the provision of the Constitution of the United States forbidding the impairing of contracts: Bishop on M. and D., sec. 667; 16 Maine 481; 8 Conn. 541.

A special act dissolving marriage is not a retrospective law: Bishop, sec. 678; *Bryson* v. *Campbell*, 12 Miss. 498.

A legislative divorce is essentially different from a judicial one, although it bears the same name, and, to a certain extent, answers the same end: Bishop, sec. 990; *Roberts* v. *Roberts*, 4 Smith, Pa., 265.

Under certain circumstances of acquiescence, a legislative divorce is held valid in Mo.: *Richeson* v. *Simmons*, 47 Mo. 20.

Under certain circumstances, a fraudulent decree of divorce was upheld on account of acquiescence: *Zoelner* v. *Zoelner*, 46 Mich. 511.

A divorce from the bonds was originally a legislative act: Encyclopædia Brittanica, title Divorce.

ZANE, C. J.:

This is an appeal from the judgment of the district court affirming a decree of the probate court, denying the right of Sophia E. Higbee, the petitioner, as widow of the late Lyman P. Higbee, and distributing his entire estate to another.

It appears from the findings that Lyman P. Higbee died intestate at Ogden City, Utah territory, on the 2nd day of February, 1883, leaving an estate which, after the payment of all his just debts, amounted to about $3000. The petitioner is entitled to one half this estate if, at the time of his death, she was his lawful wife.

The facts are that petitioner was married to deceased at

Fon du Lac, in the state of Wisconsin, on the 23rd day of August, 1866; that they continued to live together as husband and wife till 1869, when he sent her to California on account of her delicate health, with the mutual expectation that she would return to him in Idaho, or that he would join her in California and establish his residence there; that he ceased to contribute to her support within a year thereafter, although she was dependent upon him; that she was willing and desirous to return to him, but he neither joined her in California nor furnished her means to return to him; that he was afterwards elected to the legislature of the territory of Idaho, and, while he was acting as a member thereof, that body passed an act, which, without preamble or recital, simply declared "that the bonds of matrimony existing between Lyman P. Higbee, of Malad City, in the county of Oneida, this territory, and Sophia E. Higbee, be, and the same are hereby absolutely dissolved, and that this act shall take effect and be in force from and after its passage." It was approved December 28th, 1874. It also appears that Sophia E. Higbee had no notice of this act until 1876, when she saw an announcement of it in a newspaper sent to her by a third person.

To decide this question it is necessary to determine whether the divorce was within the grant of legislative power to the territory of Idaho. The Federal government is one of enumerated and delegated powers, and possesses none except such as are necessary to the exercise of those expressed. The second clause of the third section of the fourth article of the Constitution of the United States is: "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States." "No one," says Judge Story, "has ever doubted the authority of Congress to erect territorial governments within the territory of the United States, under the general language of this clause:" 2 Story on Const., sec. 1325.

Rules and regulations in a legal sense mean laws. Blackstone says that "municipal law is a rule of civil

conduct prescribed by the supreme power in a state." A divorce is not a rule or regulation. "The divorce act is a judgment, though not pronounced by a court;" if it has any effect, it is the dissolution of the bonds of matrimony between husband and wife—a decree which terminates the rights and duties of the marriage relation. It is confined to the parties to the marriage, and therefore cannot be a rule or regulation. Congress unquestionably has the power to enact laws with respect to marriage and divorce in the territories—to protect the former, and to specify the causes for the latter, and the mode to be pursued in obtaining the latter. But, so far as we are advised, Congress has never exercised or claimed authority to grant divorces.

Territorial legislatures have not the supreme legislative power. That is vested in Congress and so continues: Chief Justice Waite in *National Bank* v. *Yankton,* 101 U. S. 133, defines the territorial status as follows: "A territory within the jurisdiction of the United States, not included in any state, must necessarily be governed by and under the authority of Congress. The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective states, and Congress may legislate for them as a state does for its municipal organizations. . . . Congress may not only abrogate the laws of the territorial legislature, but may itself legislate directly for the local government. It may make a void act of the territorial legislature valid, and a valid act void."

Section 1851 of the Revised Statutes of the United States provides that "the legislative power of any territory shall extend to all rightful subjects of legislation, not inconsistent with the Constitution and laws of the United States." Only legislative power is conferred, and is extended only to rightful subjects of legislation, so that, even if Congress has the power to grant divorces, it has not conferred it on the territorial legislatures. The Federal and state constitutions limit the legislative powers of the various states, and those powers may extend to

judicial subjects, when they are found within the limitations. The powers of government are distinguished and classified with respect to their purposes and uses. Those necessary to enacting laws are termed legislative; those employed in ascertaining facts from evidence, and in construing and applying the law, are called judicial, and those used in executing judgments, decrees and commands are named executive. Experience and observation have demonstrated that a legislative body, and the forms and methods which it employs, are best adapted to express the will of the people in laws; and that a tribunal constituted as a court is, and the forms and methods which it employs are best suited to the investigation of evidence relating to the varied contentions among men, which the government is called upon to settle.

During its early history, all the authority of the British government was in the king, and he exercised executive, legislative and judicial power. Later, parliament exercised judicial, as well as legislative, authority. But "divorces granted by the parliament of Great Britain were not legislative, but judicial; and, according to the article on divorces in the Encyclopædia Brittanica, the proceeding was a judicial one by a legislative process."

In *Jones* v. *Jones*, 12 Pa. St. 350, Justice Coulter thus refers to divorces by parliament: "In England, parliament has frequently annulled the contract of marriage for adultery. There is, perhaps, more reason for the practice there than existed in this state for the exercise of a similar power by the legislature, because parliament is a court. Lord Coke says it is the highest and most honorable court in the kingdom. But that high court proceeds with the utmost circumspection, examines witnesses to prove the adultery, and, in cases where the guilty parties have not left the realm, requires that there shall also have been a trial in the common law courts for criminal conversation, and damages recovered; also that a sentence of divorce in the spiritual court should have been decreed, which can only divorce *a mensa et thoro*; hence the necessity of the intervention of parliament to divorce *a vinculo* whose power, only, is adequate to that end."

Following precedents furnished by the British parliament, legislatures in this country granted divorces, but those which have been sustained by the courts, in nearly every case, were for cause, and therefore judicial, and can not be claimed as the rightful subject of legislation.

The Pennsylvania Constitution of 1838, sec. 14, art. I., provided: "The legislature shall not have power to enact laws annulling the contract of marriage in any case where, by the laws, the courts of this commonwealth are, or hereafter may be, empowered to decree a divorce;" "from which," the court in the case of *Jones* v. *Jones, supra,* held, "an implication results of a power to annul the marriage contract in the non-enumerated cases;" and, further, that it was admissible to show on what charge the legislature proceeded, with a view to determine whether it was one upon which the courts were authorized to grant the divorce. In the case of *Starr* v. *Pease,* 1 Conn. 540, the divorce questioned was granted upon notice, and upon evidence, and for cause. The act was as follows: "Upon the petition of Martha M. Lewis, representing to this assembly that she was lawfully married to John L. Lewis on the twenty-third day of September, 1799, and that on or about the fifteenth day of January, 1826, the said John L. Lewis indulged in such criminal intimacies with one Nancy B. Jones as amounts to adultery, as nearly as could be without the actual perpetration of the crime, and praying for a divorce as per petition on file, and the said allegations, after hearing the said petitioner and said John L. Lewis, with their witnesses and counsel, being found true, *Resolved,* by this assembly, that the said Martha M. Lewis be, and she is hereby, divorced from her said husband, the said John L. Lewis, and is hereby released and absolved from all obligations by virtue of said marriage."

The court said the act "affirms the contract of marriage and declares that the acts proved were such as ought to dissolve it," and resolved accordingly. In answer to the objection that the act was not within the jurisdiction of the legislature, because the Constitution separated the legislative from the judicial powers, the court, in sub-

stance, said that the Constitution does not so separate them, as to prevent the legislature from exercising judicial powers in certain cases.

The mixed powers of the Connecticut legislature came under discussion in the supreme court of the United States in *Calder* v. *Bull,* 3 Dall. 386. Paterson, J., said that the legislature acted "in a double capacity—as a house of legislation with undefined authority, and also as a court of judicature in certain exigencies. . . . . From the best information, however, which I have been able to collect on this subject, it appears that the legislature or general court of Connecticut, originally possessed and exercised all legislative, executive and judicial authority." And it would appear that the divorce in question has been granted in the exercise of judicial authority.

Thus it will be found, upon further examination, that nearly all of the divorces granted by legislatures, and sustained by the courts, were so granted in the exercise of judicial power—that they were recognized as judicial subjects, and not as legislative.

A divorce granted for cause is not a legislative divorce. Mr. Bishop says: "A divorce, like every other statute, would appear, necessarily, to flow merely from the sovereign will. It is not the ascertainment of a right, but the creation of one:" 1 Bish. on Mar. and Div. 689.

But the purpose of laws is to protect rights and enforce duties, not to destroy the former nor to relieve from the latter; municipal law does not create rights. A divorce granted without cause would destroy the lawful rights of one party and release the legal duties of the other, and hence law is invoked to abrogate them. "A wife has a right to the love and protecting care of her husband; she has a right to share his bed and board; she has a right to support, consisting of necessary food and clothing, according to her position in life." And these rights are answered by corresponding duties from the husband.

In the absence of misconduct on her part, it is impossible for him to shake them off; they exist for life, and if he dies first, her rights survive to his estate. The petitioner is now contending for the latter.

The legislature of the territory of Idaho attempted to try petitioner's case without evidence, and, at one blow, to make the law and the decision which severed all her rights as wife.    By the common law, marriage is for life, and indissoluble except for cause.

In the case of *Smith* v. *Smith*, 13 Gray 209, Shaw, C. J., said: "Marriage is undoubtedly a contract, but it is a contract sanctioned by law, controlled by considerations of public policy vital to the order and harmony of social life, and in its nature indissoluble except by violation of duty on the one part, to be taken advantage of in a special manner provided by law on the other."

From the point of view from which we are considering this case, it is immaterial whether marriage is held to be a contract or a status.    In either case the rights which the relation affords, and the duties which it imposes, are equally under the protection of the law.

Marshall, C. J., in *Gaines* v. *Gaines*, 9 B. Mon. 295, said: "It is the province of the legislature, so far as individual rights are concerned, to pass laws as a rule of action for the community at large, or for a particular class, or for individuals, under certain circumstances to be defined by law.    It is the province of the judicial power to administer these laws, by applying them to the facts in individual cases, for the ascertainment of the right, and the redress or repression of the wrong.    It is essential to the stability and security of individual rights that they should be determined by pre-existing laws under which they have originated, and by general laws operating upon similar rights, and not by laws made merely for their decision, when they come to be contested.    It is to avoid the danger of individual rights being determined, not by pre-existing laws, but by a law first promulgated in the decision itself, or made for it, or by the secret law of will or discretion, that the judicial department, entrusted with the power of ascertaining and enforcing private rights, as created and sustained by law, is prohibited from exercising legislative power; and it is for the same reason that the legislative department, entrusted with the power of making, altering and repealing laws, is prohibited from

the exercise of the judicial power, which is but the power of applying the existing laws to the facts, and thence deducing and establishing the rights in contest. But it is in vain that the Constitution has vested this power exclusively in the judiciary department, and said it shall not be exercised by the legislative, if, when a party alleging injury by the deprivation of a right, has resorted by the appropriate remedy to the appropriate tribunal for redress, the party accused of wrong may appeal to the legislature, obtain the passage of an act, not to change the general laws by which all similar cases are to be governed, nor to change the organizations or jurisdiction of the courts, by which others as well as himself will be affected, but an act for his own exclusive benefit, to operate only between himself and his antagonist, and, by extinguishing the right asserted against him, to stifle judicial inquiry, and to arrest the administration of the law in his case, and save him from all those consequences to which the general laws would subject him, if he had committed an injury to the rights of another."

To the same effect Kent, Ch. J., in *Dash* v. *Van Kleeck*, 7 John. 508, said: "The power that makes is not the power to construe a law. It is a well settled axiom that the union of these two powers is tyranny. Theorists and practical statesmen concur in this opinion."

The legislature of the territory of Idaho had passed a general law, in which causes for divorce were specified, and a trial in court secured. But it granted the divorce against the petitioner without notice and without cause, and, if the granting was valid, the votes and formalities which made the law pronounced the decree. In the general law the legislature recognized the principle that personal rights cannot be taken away without an opportunity to the person to whom they belong to be heard. It was said by Webster in the celebrated Dartmouth College case, 4 Wheat. 519, that "by the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial;" and, likewise, Judge Cooley, Const. Lim. 491: "Every one has a right to demand that ·

he be governed by general rules; and a special statute, which, without his consent, singles his case out to be governed by a different law from that which is applied in all similar cases, would not be a legitimate legislation, but would be such an arbitrary mandate as is not within the province of free government. This is a maxim in constitutional law, and by it we may test the authority and binding effect of legislative enactments."

Notwithstanding the general act, this legislature supposed that it possessed the power to hurl its fiats against such as it chose, which, like the lightning, should strike first and thunder afterwards.

By calling marriage a status, some writers appear to think that the individual rights belonging to marriage are lost, and that the state then has absolute power to treat it as it pleases.  In time of insurrection or war, private rights appear to be lost sight of, but a just government must compensate its loyal citizens for the losses which they may have sustained.  Similarly, private property may be taken for the public use, but compensation must be made.  Taxes may be exacted, but personal security and protection are given in return.  But the private rights which belong to marriage can not be taken away on any such grounds as these; for the only interest which the public can have in the institution of marriage is to regulate and protect it.  On account of the misconduct of one party, the court may declare, at the instance of the other, that the rights resulting from marriage are forfeited.  Yet it does not follow that the individual rights of the parties may be disregarded, because the public have an interest in the institution of marriage.  Both classes of interest exist together, and both should be secured and protected.  All persons, with respect to their marital rights, are equal before the law; and the state must extend to all equal, exact and even-handed justice.  Therefore the act of the legislature of Idaho can not be sustained, without holding that the granting of a divorce is a rightful subject of legislation, without violating that great principle of* equalness upon which all justice and all equity repose, and without denying to the petitioner the benefit of the law of the land,

and refusing her a day in court and a right to a fair trial.

The act can not be upheld on principle—the authorities are conflicting. The constitutions of thirty-one states forbid legislative divorces. None have ever been granted in this territory, and but few in any of the territories. Neither of the parties to the marriage in question ever married again, and no serious consequences are likely to follow from holding that the act in question is void.

The decree of the lower court is reversed, and the cause remanded, with direction to enter a decree in harmony with this opinion.

TWISS, J., and EMERSON, J., concurred.