## IN RE HERMAN J. CHRISTIANSEN.

1. *Insanity—Opinions of Persons not Experts.*
   Acquaintances of a person whose sanity is the subject of judicial inquiry, when able to instance expressions or acts of sanity or insanity, though not experts, may give their opinions as to the sanity or insanity of such person.

2. *Decree of Divorce—When Void.*
   A decree of divorce granted without jurisdiction of the subject-matter or of the person, or without any cause for divorce stated, and without proof, is absolutely void.

3. The act of the legislature of the territory of Utah of March 6, 1852, so far as it is purported to confer general common-law and chancery jurisdiction, on probate courts, was absolutely void.

4. *Void Decree—Cannot be Validated.*
   A decree rendered against a defendant, without jurisdiction of the subject-matter of the suit, or of the person, or without any cause of action stated in a petition or complaint, and without proof, cannot be validated or confirmed by subsequent legislative enactment.

5. *Jurisdiction—Intendment or Presumption.*
    If the law purporting to confer jurisdiction on the court to try a case is void, no intendment of law or presumption of fact can be made in favor of its jurisdiction.

6. *Voidable Judgment—May be Validated.*
    If the court has jurisdiction of the subject-matter of the suit and of the person of the defendant, and omits some essential step which the legislature had the right to dispense with, and renders judgment against him, the legislature may validate the judgment.

7. *Void Judgment—Cannot be Validated.*
    The law making power cannot validate void judgments.

8. *Divorce—Congress Cannot Grant.*
    The affirmance of a void decree nine years after it was rendered, as claimed by defendant, would be an exercise of judicial power by congress in granting a decree,—a power it does not possess, and which it has never attempted to exercise.

9 The legislature cannot grant a divorce at the instance of the party at fault, without the consent of the party not at fault.

10. *Divorce—Defendant Should Have His Day in Court.*
    A divorce cannot be lawfully granted except for sufficient cause, and without notice to the party complained of, or appearance, and such a proceeding is judicial in its nature.

11. An estoppel cannot be based on a void decree.

(Decided June 27, 1898.)

Appeal from district court, Seventh district; Jacob Johnson, *Judge.*

Petition by Hannah Christensen for a widow's allowance in the estate of Herman J. Christensen, deceased. From an order denying relief, petitioner appeals. *Reversed.*

*Moyle, Zane & Costigan* and *W. D. Livingston,* for appellant.

To allow such an act validity destroys vested rights and turns a legislative into a judicial body.

This court has recognized marriage as conferring rights. *Higbee* v. *Higbee*, 4 Utah 19; *Holmes* v. *Holmes*, 4 Barb. 295.

It has denied judicial authority to the legislature in the late well-considered case of Handley's estate, 49 Pac. Rep. 829. This principle precludes a legislature from making a void decree valid. Sutherland Stat. Const. sec. 484; Cooley Const. Lim. 383; note at 37 Am. Rep. 397; *Pryor* v. *Downey*, 50 Cal. 388; *Roche* v. *Walters*, (Md.) 19 Atl. Rep. 535; *Willis* v. *Hodson*, (Md.) 29 Atl. Rep. 604; *Greenough* v. *Greenough*, 11 Pa. St. 489; *Richards* v. *Rote*, 68 Pa. St. 248; *Nelson* v. *Rountree*, 23 Wis. 370; *McDaniels* v. *Carroll*, 19 Ill. 228; 68 Am. Dec 587; *Yeatman* v. *Day*, 79 Ky. 186; *Maxwell* v. *Goetchins*, 40 N. J. L. 383; 29 Am. Rep. 242.

*Reid & Cherry*, and *Rawlins, Thurman, Hurd & Wedgwood*, for respondent.

ZANE, C. J.:

It appears from the record in this case that Herman J. Christensen, late of the city of Manti, in the county of Sanpete, in the state of Utah, died intestate on June 26, 1897, the owner of real and personal property valued at $77,571.96; that three children by Hannah Christensen, his first wife, and two children by his last alleged lawful wife, Petrea Sorenson Christensen, from he was divorced, after their birth, survived him; that after Luther T. Tuttle had been appointed administrator of the intestate's estate, and had filed an inventory thereof in the probate court of said county, Hannah Christensen, by her guardian, Theodore E. Christensen, filed her petition, as the intestate's widow, for an allowance from his estate. It also

appears that the administrator of the intestate answered the petition admitting the marriage, but alleging a divorce on December 5, 1854, by a decree of the probate court of Sanpete county, and that petitioner afterwards intermarried with John Hathaway, and that she was therefore estopped from claiming she was the widow of the decedent. It further appears that the district court, sitting for the disposition of probate business, after hearing the evidence offered by both sides, without making findings, entered an order denying the prayer of the petitioner. From this order the petitioner, by her guardian, has appealed to this court.

These alleged facts present for our decision the question, was petitioner the lawful wife of the intestate at the time of his death, and as his widow is she entitled to an interest in his estate? The determination of that question requires us to decide upon the validity of the alleged decree; and, if we shall find the decree to be void, to decide whether her conduct estops her from obtaining the rights of a widow. An issue as to petitioner's sanity was also raised on the trial. Insanity, if found, would appear to be more pertinent to the question of estoppel, but we think it should have a bearing upon the decision of the other question. Therefore we will first consider the evidence upon that issue.

It appears from the evidence in the record that the petitioner and the intestate were married in the kingdom of Denmark about 1843; that three sons were born to them there; that a daughter was born to them upon the plains.

Mrs. Snow, an old resident of Manti, who knew them in Copenhagen, and emigrated to Utah in the same company, testified, in substance, that Hannah Christensen had great trouble because her husband, after they reached this country, always wanted to get rid of her,

and take the children from her, and was always looking after other women; that he took up with a girl by the name of Elizabeth, while crossing the plains, whom he married at Springville, Utah, on the way to Manti. Witness knew the petitioner was left behind at Salt Lake City; that she followed out to the Jordan river, and her husband took her back; that she knew them afterwards in Manti; that her troubles appeared to unhinge her mind; that she had a great deal of trouble, and had queer ways; that there always appeared to be something on her mind vexing her, caused by her husband's actions; that petitioner's peculiar actions indicated her mind was affected; that her mental condition has appeared better since the death of her husband.

Elsie C. Dungar also testified, in substance, that she came across the plains in the same company with Herman J. Christensen and Hannah, his wife. Their first stop was at Salt Lake City. Remembered the time when Herman tried to get rid of his wife. He put her away. She wanted to come with him and the children. When the company left, she went out in the night to the camp. They had three little boys, and a little baby, Sarah, born on the plains. The petitioner followed out to the camp, and her husband and another man took her back to Salt Lake City, because he did not want to take her with him. He took the boys, and left the baby with her mother. He had a woman with him, who was the first one he married afterwards. The petitioner afterwards followed her husband. She was troubled after she reached Manti, because her husband had put her away, and she was flighty—wrong in her mind. She could work a little. She had no place to go to. She remained in Manti many years, and lived at witness' home part of the time. After her sons

grew up, they built her a small house. Afterwards she was moved to Gunnison, a neighboring town, for a time. She traveled around the streets night and day. She came to witness' house many times, and would sleep there. She was running around like an irresponsible person. She had no home there.

Theodore Christensen testified, in substance, that he was the second son of the petitioner and intestate. The eldest son was dead. Witness was born in the kingdom of Denmark in 1845, and came with his parents to Utah in 1853, and remembered the trouble when his mother was left behind, and the children were brought to Manti. Remembered her following out to the camp when they left Salt Lake, and how she hung on to the wagon, and tried to come with the children. Remembered all that. "At that time after the trouble began, my mother's mind failed her. It became very weak. She appeared to be losing her reason. Witness noticed the change, even as a boy. His mother followed them to Manti, a few months after she was left behind. When she got there she was not allowed to see her children. She came to the house and to the windows, and was screaming and crying, and we children wanted to get out to her, and were not allowed to. Quilts were put up to the windows, and some woman came, and said, 'For God's sake, let her see her children.' After that she would come every little while to see us, but was not allowed to stay. She appeared to be out of her right mind. Recently her mental condition has improved." The children on the streets called her "Crazy Hannah" (witness objected to that). At times she would talk rationally, and at other times she appeared crazy. Witness' father brought another woman with him to Manti. Did not know why his mother was left behind

17 UTAH—27

and deserted. When witness grew up, he built a little house for her, and his mother and Sarah lived there until she moved to Gunnison. We boys took care of her after we grew up. She has wandered around a good deal.

Titus Christensen, the third son, testified, in substance, that he was two years old when his father and mother reached Salt Lake City, and can remember as far back as 1860. Witness remembered that he liked to go and see his mother, but his father would object. That his mother talked about his father a great deal, and appeared to be confused and bothered. After witness got old enough, he thought she was deranged. She said wild things. She treated witness well, but she would talk to herself about reformation. Was troubled about the way father was doing. After witness grew up, people told them they ought to have a guardian appointed for her.

Witness Luke testified, in substance, that he had known the petitioner since 1854. That his wife had employed her to wash for her. Sometimes she would talk reasonably, and at other times her mind appeared to be unbalanced. That was his deliberate judgment. When the name of her husband was mentioned, or her children were spoken of, she would fall all to pieces. She would say Herman was a villain. Had robbed her of her children. Witness would try to pacify her, but it did no good. Some people called her "Crazy Hannah." She was treated like a crazy person.

Sarah Martin testified, in substance, that she was the daughter of petitioner and intestate, and was born on the plains. Could remember living with her mother as a child. She made pictures on the walls, and said that was witness' father. Sometimes she would say the devil was after him with big sticks. She would run out at all hours of the night screaming, and witness would lay in bed,

when a little girl, also screaming. "Her mental condition has continued the same until the present, except of late years she was been more calm, but she still makes the pictures on the walls, and thinks they are trying to murder her." Whenever she would talk about witness' father, she would go into a frenzy. Witness and her mother lived for a while in an old cellar. Her mother broke pictures once; and set the house on fire at another time, and partially burned it. She said something bothered her; that she could hear it all the time, but she could not tell what. It was reported that Hathaway was a deserter from Johnson's army, and drifted to Manti, and her mother was a poor demented woman running around, and that he took advantage of her.

In substance, such was the testimony of the witnesses who knew the petitioner longest and most intimately. Other witnesses, who saw petitioner occasionally, and whose acquaintance was not so intimate, did not think she was insane. Some of them, however, who had talked with her, testified that, when her husband's name would be mentioned, she would become agitated and greatly excited.

The opinions of witnesses not competent as experts, and not intimately acquainted with persons whose sanity is the subject of investigation, unless they have closely observed their appearance and expressions, are worth but little; while the opinions of intimate acquaintances who have been close observers of their conduct, though not competent as experts, when they can instance acts indicating mental derangement, are often more reliable and more valuable than professional experts, who have not had the benefit of such intimate acquaintance. It must be conceded that the treatment of this woman, and the wrongs and hardships she endured were well calculated to agitate

her feelings, and arouse her emotional nature, becloud her reason, and to impair and unsettle her mental balance and equilibrium. One witness, who had known her in Denmark, after speaking of her troubles on the plains, at Salt Lake, and Manti said, in her judgment, "They unhinged her mind." Another said, "Her mind became unbalanced." Another said that "she talked queer—not like others in similar trouble; that she was flighty, and her mind was wrong." Another said she was regarded as crazy; that she was called "Crazy Hannah." Her daughter said she would get out of bed at night, and go screaming into the street; that she covered the walls of her house with pictures, and called some of them devils with big sticks after her husband; that she broke pictures on one occasion, and set her house on fire on another, saying they bothered her; that she was tired of living there; that she could hear them all the time, but she did not know what.

Such are some of her acts and expressions, detailed by those who knew her best. It would appear that her feelings and her emotional nature were subject to uncontrollable excitement and agitation, and that her mind was haunted with delusions, and that, therefore, it was not in its normal condition. There is no evidence tending to prove that her mind was unsound before her husband deserted her and took another wife, and forcibly separated her from her children. After she had been put away by her husband (as one witness expressed), and she was left behind, and had attempted to follow and hold on to the wagon in which her children were, and after she had been in the night forcibly brought back to Salt Lake by her husband and another man, and after she had followed her husband and children more than 150 miles, to Manti, and was denied admission to the house where her children were, or the privilege of seeing them, she became inca-

pable of controlling her feelings and emotions and of exercising her reason. Her mental equilibrium and balance was overthrown, and a cloud passed over her mind, her life was blasted, and she was left a mere wreck. There can be no doubt that the case of this much wronged and abused woman appeals strongly for remedial justice, and that she should be given a portion of her husband's estate during the remainder of her days, if the rules of law will permit.

The decree on which the administrator relies to show the petitioner was not the intestate's wife, at the time of his death, is as follows: "December 5, 1854. Probate court of Sanpete county, in session, by a special call by his honor, George Peacock, in place of the regular term of the following Monday, and proceeded to business. The court then proceeded to investigate the charge contained in the petition presented by Hammond J. Christensen v. Hanne Christensen for divorce. Polance Koffert was sworn as interpreter to interpret the Danish language. The court heard the testimony, and decided that Hammond J. Christensen be divorced, and that he have control of three children, namely, Julius H. Christensen, Theodore Edward, and Titus I. E. Christensen, and Hanne Christensen to have F. C. Christensen, aged 18 months, until otherwise directed by the court, and the said Hammond J. Christensen to pay all costs of suit, which is $10.00. Court adjourned. George Peacock, Probate Judge." To its admission in evidence the petitioner, by his counsel, objected on numerous grounds, and exceptions were taken to its admission. The decree recites that the court was in special session by a special call of the judge, in place of the regular term, in convene on the following Monday. By what authority such special session was called and held does not appear from the record.

The decree also recites that the court proceeded to inves-
tigate the charge contained in the petition presented by
Hammond J. Christensen against Hanne Christensen for
divorce. It appears from the transcript that petitioner's
husband was named Herman J. Christensen, while the
name in the decree is Hammond J. Christensen. It is not
stated what the charge in the petition was, or what the
petition contained, and there were no findings made by
the court, and it does not appear otherwise that there
was any petition filed. It is recited that the court heard
the testimony, and decided that Hammond J. Christensen
be divorced (from whom it is not mentioned), and that he
should have control of three children, naming them, and
that Hanne Christensen should have F. C. Christensen,
aged 18 months, until otherwise ordered.

Counsel for the petitioner insist that the foregoing de-
cree is absolutely void for several reasons: First, because
the probate court, who assumed to render it, did not have
jurisdiction of the subject-matter of the suit. An act of
the territorial legislature in force March 6, 1852, under
which the probate court assumed jurisdiction to enter the
decree, expressly provided that probate courts should
have jurisdiction in all cases of divorce. But that legis-
lature possessed only such authority to confer jurisdic-
tion on those courts as the act of congress known as the
"Organic Act" conferred upon it. While that act con-
ferred common-law and chancery jurisdiction upon the
supreme and district courts, respectively, it gave to the
probate court only such jurisdiction as its name indicated,
—such as that court had theretofore exercised in Eng-
land and in the United States. It did not give it general
jurisdiction in chancery or at law, nor did it authorize
the legislature of the territory to do so. Divorce causes
belong to chancery jurisdiction. In *Ferris* v. *Higley*, 20

Wall. 375, the supreme court of the United States held that the territorial law now in question, so far as it purported to confer general common-law and chancery jurisdiction on the probate courts, was absolutely void. *Perea* v. *Barela,* (N. M.) 27 Pac. 507; *Perea* v. *Barela,* 23 Pac. 766; *Cast* v. *Cast,* 1 Utah 112; *Higbee* v. *Higbee,* 4 Utah, 19. The authority of the court to try a cause and render judgment must be determined from the facts alleged as the cause of action and the law conferring and limiting its powers. If the only law purporting to confer jurisdiction on the court to try the case is void, then all acts of the court are without authority, and also void. In such a case, no intendment of law or presumption of fact can be made in favor of its jurisdiction, whether it be as to the subject matter or the person, or as to averment or proof. Therefore we must hold the decree admitted in evidence absolutely void: (1) Because the court had no jurisdiction to try a divorce case; (2) Because there was no proof of service of notice on the defendant; (3) because it does not appear that any cause for a divorce, such as the law required, was stated; and (4) because it does not appear that any proof was made on which to grant the decree. It is true that one witness testified that Hannah Christensen was present, and said she did not want to be divorced. That could only be regarded as an objection to the divorce, not as an entry of appearance, even if she had been competent to enter her appearance. Freem. Judgm. (4th Ed.) §§ 120, 123; *Galpin* v. *Page,* 18 Wall. 351. "A judgment pronounced by a tribunal having no authority to determine the matter in issue is necessarily and incurably void, and may be shown to be so in any collateral or other proceeding in which it is drawn in question." 1 Freem. Judgm. § 120; Brown Jur. § 1.

Counsel for the intestate's estate rely on the following provision of section 3 of an act of congress in force June 23, 1874, as follows: "All judgments and decrees heretofore rendered by the probate courts which have been executed, and the time to appeal from which has by the existing laws of said territory expired, are hereby validated and confirmed." A preceding clause of the same section expressly provides that "probate courts, in their respective counties shall have jurisdiction in the settlement of estates of decedents and in matters of guardianship and other like matters; but otherwise they shall have no civil, chancery, or criminal jurisdiction whatever; they shall have jurisdiction of suits of divorce for statutory causes concurrently with the district courts." In addition to the territorial statute of March 6, 1852, intended to confer jurisdiction upon the probate courts of the territory to grant divorces, the same legislature passed an act in force January 19, 1855, section 29 declaring: "The several probate courts in their respective counties have power to exercise original jurisdiction, both civil and criminal as well in chancery as at common law, * * * and they shall be governed in all respects by the same general rules and regulations as regards practice as the district courts." Under this provision the probate courts for nine years had assumed jurisdiction to try causes and render judgments in criminal and civil cases both at law and in equity. During this time men had been tried in those courts in the various counties, and convicted of various crimes, and sentenced to imprisonment or fined, and had served terms of imprisonment; others had paid their fines. Judgment had also been rendered against parties for sums varying in amounts, which had been paid, and determining property rights that had been executed. Doubtless congress presumed the parties had been served with process, or had

appeared, and had received justice; that in some cases sentences had been made upon pleas of guilty; that some of the judgments and decrees in civil cases had been by agreement or confession; that many had been paid, and possession of property, personal or real, had been given under others; and in that way the judgments or decrees had been executed, and justice had been done. It does not appear from the language of the curative provision that congress understood that the judgments and decrees referred to were absolutely void. Judgments and decrees that had been executed, and from which the time for appeal had expired, were intended. No appeal can be necessary from a judgment that is entirely and absolutely void. Such judgments and decrees are of no effect, and parties endeavoring to execute them may be treated as trespassers. As we have seen, "a judgment pronounced by a tribunal having no authority to determine the matter in issue is necessarily and incurably void, and may be shown to be so in any collateral or other proceeding in which it is drawn in question." Again, the same author says: "A void judgment is, in legal effect, no judgment. From it no rights can be obtained. Being worthless in itself, all proceedings founded upon it are equally worthless. It neither binds nor bars any one. All acts performed under it, and all claims flowing out of it, are void. The parties attempting to enforce it may be responsible as trespassers. The purchaser at a sale by virtue of its authority finds himself without title and without redress." Freem. Judgm. §§ 117, 120.

At the time the curative provision in question was enacted by congress, the cases of *Cast* v. *Cast* and *Ferris* v. *Higley, supra,* declaring the probate courts of Utah had not common-law or chancery jurisdiction, and that so much of the act of the territorial legislature as purported

to give them jurisdiction in divorce cases and general jurisdiction in criminal and civil cases were absolutely void, had not been rendered. We are therefore not disposed to hold that congress intended to make a decree like the one admitted in evidence, and relied upon in this case, valid,—a decree rendered without jurisdiction to grant a divorce, and without jurisdiction of the person of the defendant, and in which it did not appear that a petition was filed stating any cause for divorce, as the law required, and in which it did not appear that any proof was made of a cause for divorce, as required by law; and if the national legislature had, by the provision in question, intended to validate such a decree, absolutely void beyond all question, the provision would have been as void as the decree. The United States is based on the will of the people, possesses only such powers as they have expressly conferred upon it, and such as are necessary to the use of such as are expressed, and no more. And the legislative branch of those delegated powers congress possesses. It does not possess absolute power. It has no more power to make a valid decree out of a void one than it has to make such a decree out of a sheet of blank paper. It cannot make black white, or white black, or something out of nothing. Undoubtedly, the law-making department of the government may validate judgments and decrees voidable on account of errors or irregularities merely. If the court has jurisdiction of the subject-matter of the suit and of the person, and some essential step is omitted which the legislature had the right to dispense with, it may validate the judgment or decree, notwithstanding the omission or irregularity. The legislature prescribes the methods and mode of procedure, and the rules under which judicial power shall be exercised, and in doing so may dispense with such formalities as are not

essential to the jurisdiction of the court. Whatever it may have dispensed with by law before action brought, it may dispense with by statute afterwards. It cannot, however, dispense with jurisdiction of the subject-matter of the suit, or of the parties, nor with a complaint, declaration, petition, or claim. There must be some right, duty, or claim specified. There must be a subject-matter stated, and it must be such a one as the court has the right to take jurisdiction of, and, if the judgment or decree is to be based upon facts, they must be first ascertained and found to exist. These requirements are essential to remedial justice, and appear to be axiomatic.

Judge Cooley says: "We have elsewhere referred to a number of cases where statutes have been held unobjectionable which validated legal proceedings, notwithstanding irregularities apparent in them. These statutes may as properly be made applicable to judicial as to ministerial proceedings; and although, when they refer to such proceedings, they may at first seem like an interference with judicial authority, yet if they are only in aid of judicial proceedings, and tend to their support by precluding parties from taking advantage of errors which do not affect their substantial rights, they cannot be obnoxious to the charge of usurping judicial power. The legislature does, or may, prescribe the rules under which the judicial power is exercised by the courts; and in doing so it may dispense with any of those formalities which are not essential to the jurisdiction of the court; and whatever it may dispense with by statute anterior to the proceedings, we believe it may also dispense with by statute after the proceedings have been taken, if the court has failed to observe any of those formalities. But it would not be competent for the legislature to authorize a court to proceed and adjudicate upon the rights of parties, without giving

them an opportunity to be heard before it; and, for the same reason, it would be incompetent for it, by retrospective legislation, to make valid any proceedings which had been had in the courts, but which were void for want of jurisdiction over the parties. Such a legislative enactment would be doubly objectionable. First, as an exercise of judicial power, since, the proceedings in court being void, it would be the statute alone which would constitute an adjudication upon the rights of the parties; and, second, because, in all judicial proceedings, notice to parties and an opportunity to defend are essential,— both of which they would be deprived of in such a case. And for like reasons a statute validating proceedings had before an intruder into a judicial office, before whom no one is authorized or required to appear, and who could have jurisdiction neither of the parties nor of the subject-matter, would also be void."

The weight of authority is undoubtedly against the proposition that the lawmaking power may validate void judgments and decrees, and we find no authority for the validation of such a decree as the one relied upon by the administrator. Authority is against it. Some of the cases, however, fail to distinguish between void and voidable judgments. Nor do we think it can be supported on principle. *McDaniel* v. *Correll*, 19 Ill. 226; *Richards* v. *Rote*, 68 Pa. St. 248; *Roche* v. *Waters*, (Md.) 19 Atl. 535; *Nelson* v. *Rountree*, 23 Wis. 367; *Yeatman* v. *Dey*, 79 Ky. 186; *Maxwell* v. *Goetschius*, 40 N. J. Law, 383.

It is claimed, however, that congress had the power to grant the divorce in question, and could, therefore, validate this void decree by a law enacted 10 years after it was framed. Congress attempted to validate judgments in criminal and civil cases which had been executed. The effect of the curative act was (if held to validate the de-

cree in question) to divorce the petitioner from her late husband, and make the divorce take effect 10 years before it was actually granted. But congress is a legislative body. It is not vested with judicial powers, like the British parliament and many of the states of this Union during their early history; nor has congress ever attempted to exercise such judicial power, as some of the state legislatures, after their constitutions had partitioned the powers of the state government, and confined their functions to lawmaking, have. Section 1, art. 1, Const. U. S., declares that "all legislative power therein granted shall be vested in a congress of the United States, which shall consist of a senate and house of representatives." And section 1, art. 2, declares that "the executive power shall be vested in a president of the United States of America." And section 1 of article 3 of the same instrument declares "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish." All the legislative power delegated to the national government is vested in congress, except so far as the president may participate therein, in the approval of laws or by his veto; and all the executive power is vested in the president, except so far as the senate may give effect to appointments and treaties by its advice and consent; and all the judicial power delegated to the national government is vested in one supreme court, and in such inferior courts as congress may from time to time ordain and establish, except as the senate may use such power in impeachment trials, and in such investigations as it may make in exercising its legislative power, and in requiring witnesses to appear and testify therein. It is plain that no express or implied authority to try divorce or other causes is vested in congress, but, on the contrary, all

judicial power, except as above pointed out, is vested in the judicial department of the government.

There are decisions to the effect that the granting of a divorce may be regarded as a legislative act, and that the legislature may, without any alleged cause for divorce, and without any notice to either party or opportunity to be heard, and without any proof, by an authoritative order or fiat, grant divorces; and there is a second class of cases which hold that divorce is a judicial act in those cases upon which general laws confer on the courts authority to grant divorces for cause, and that in such cases the legislature cannot grant divorces, but that the legislature may by special act grant divorces for other causes. A third class of cases, however, hold that marriage secures to the respective parties legal rights which cannot be dissolved except for sufficient cause, which must be alleged, and that the other party should have notice and an opportunity to be heard; that the truth can only be ascertained by proof; that a decree of divorce can only be granted on such proof; and that such a proceeding is necessarily judicial; and, in those states whose constitutions vest all judicial power in the judicial department of the government, decrees of divorce can only be granted by courts of justice. In the case of *Higbee* v. *Higbee*, 4 Utah 19, it appeared that Lyman P. Higbee, an attorney at law, residing with his wife in Idaho, sent her to California for her health, assuring her that he would follow. Soon afterwards he was elected to the legislature of that territory, and he induced that body to grant him a divorce from his wife without notice to her, without her knowledge, without assigning cause for divorce, and without any proof. Afterwards he removed to the late territory of Utah, and after his death his wife, as his widow, was denied any interest in his estate by the probate court; but,

on appeal to the supreme court of the territory, the legislative divorce of Idaho was held to be void, and his wife was held to be his widow, and entitled to a share of his estate. The case of *Maynard* v. *Hill*, 125 U. S. 190, is relied upon to establish the authority of congress to grant a divorce and to validate the void decree in evidence. The opinion was by a divided court. It held a divorce granted by the legislature of the territory of Oregon valid. In that opinion the court, among other things, said: "It is conceded that to determine the propriety of dissolving the marriage relation may involve investigations of a judicial nature, which can properly be conducted by the judicial tribunal. Yet such investigations are no more than those usually made when a change of the law is designed. They do not render the enactment, which follows the information obtained, void as a judicial act, because it may recite the cause of its passage. Many causes may arise, physical, moral, and intellectual,—such as the contracting by one of the parties of an incurable disease, like leprosy, or confirmed insanity, or hopeless idiocy, or a conviction of a felony,—which would render the continuance of the marriage relation intolerable to the other party, and productive of no possible benefit to society. When the object of the relation has been thus defeated, and no jurisdiction is vested in the judicial tribunals to grant a divorce, it is not perceived that any principle should prevent the legislature from interfering, and putting an end to the relation, in the interest of the parties as well as of society. If the act declaring the divorce should attempt to interfere with rights of property vested in either party, a different question would be presented."

In this it is conceded that investigations of a judicial character, to determine the propriety of dissolving the marriage relation, may be involved, and that a decree of

divorce cannot be granted except for cause; and it was further said, when the object of the marriage relation has been defeated, and no jurisdiction is vested in the judicial tribunals to grant a divorce, that no principle was perceived that should prevent the legislature from granting a divorce. It was also added that, if the act declaring the divorce should attempt to interfere with the rights of property vested in either party, a different question would be presented. Undoubtedly legislatures should pass a general law such as they may believe the happiness and welfare of society demands, specifying causes for divorces. There was such a law in force in the territory of Utah when the divorce in question was attempted to be granted, and when the validating act was passed, and the district courts were open, with undoubted jurisdiction.

Inasmuch as the welfare of society, and the happiness of the people of the state depend so largely on the family founded on marriage, and the public has an interest in its protection and maintenance, as well as the parties, some courts have gone so far as to hold the legislature may ignore the rights of the parties, and dissolve the relation, without inquiry, and without opportunity to the parties to be heard, and may disregard the rights of the husband or wife not at fault; that the legislature in that way may break up the family, and set the wife and the children adrift without any provision for support, for it is conceded that the legislature in granting the divorce cannot make a decree for alimony, or as to custody of children, or as to property. In effect, it is held by such cases that the legislature may at the instance of the delinquent, or one at fault, without inquiry, strike in the dark, and break up the family, and without warning set the wife and children adrift, humiliated and disgraced, without any provision for their support or maintenance.

The weight of authority undoubtedly is to the effect that a divorce should not be granted except for sufficient cause; that the party complained of should have an opportunity to be heard,—should have a day in court; that the decree of divorce should be upon proof; and that such a proceeding is judicial in its nature. Our conclusion is that the trial of divorce causes should be had in courts of justice under constitutions conferring judicial power on those tribunals. *Higbee* v. *Higbee*, 4 Utah 19; *Ponder* v. *Graham*, 4 Fla. 23; *Bryson* v. *Bryson*, 44 Mo. 232; *State* v. *Fry*, 4 Mo. 81; 2 Kent Comm. (13th Ed.) 106; *Dartmouth College* v. *Woodward* (Story, J.), 4 Wheat. 694; Cooley, Const. Lim. (6th Ed.) 132; *Greenough* v. *Greenough*, 11 Pa. St. 489; *In re Handley's Estate*, 15 Utah 212; *Maxwell* v. *Goetschius, supra*. When the people of Utah formed a state government, they set the question at rest for the future in this state, by forbidding the enactment of private or special laws granting divorces.

Counsel for the decedent's estate also insist that the petitioner is estopped from claiming any interest in her late husband's estate, because of her misconduct, after the void decree, in contracting a marriage with another man, or by acting towards him for a time as though they were married. An estoppel cannot be based on a void decree or judgment. If the decree or judgment is simply voidable, a different rule may be applied. When the court has jurisdiction of the subject-matter of the suit and of the parties, and the decree or judgment may be reversed or set aside for error or irregularity, if the defendant waives his right to do so, by executing or accepting it, he will be estopped from denying its binding effect; but, when such judgment is void for any reason, he will not be estopped. The void decree in controversy was obtained

by the decedent when he knew he was not entitled to it. The evidence is conclusive that about a year before the divorce he married a young girl, and, in view of that fact, his lawful wife had a complete defense to a divorce at his instance. Besides, he had deserted and abandoned his wife, and had taken her children from her under circumstances so cruel and hard as to overthrow her reason. Under such circumstances, there is no legal rule or equitable principle that would have permitted the decedent during his lifetime to be divorced from her because of her imbecility or misconduct, which his unkind and inhuman treatment brought about. Nor can his administrator or heirs rely upon it to defeat her rights as his widow. She is not responsible for the void decree, nor does it appear that she consented to it. In her forlorn, wretched, and pitiable condition she did say that she did not want a divorce, and it appears from the evidence that from that day she has been incapable of forming a rational conclusion with respect to the consequences and effects of her own actions. When her husband was the subject of conversation, her feelings and emotions overwhelmed her reason.

The disastrous consequences suggested that may follow a judgment of this court holding the decree of divorce in question of no effect, notwithstanding the curative act relied upon, are not likely to follow. Nearly 40 years have elapsed since the last of such decrees or judgments were rendered. It will, in all probability, be found that the statute of limitations and the dispensations of time have shown such decrees, and transactions in consequence of them, of the consequences feared by counsel, if they are now ascertained to have been void. Owing to the peculiar circumstances of this case, we are of the opinion that the petitioner's right to an interest in the decedent's

estate has survived, notwithstanding the statute of limitations and the lapse of time; and that this aged woman, with her physical and mental infirmities, is entitled, as his widow, to an interest in decedent's estate, and to whatever comfort it may afford her during the remainder of her days.

The order appealed from is reversed, and the court below is directed to recognize the petitioner as the lawful widow of the decedent, and to adjudicate the rights of the respective parties found to have an interest in his estate, and to make payment or distribution thereof according to law.

BARTCH and MINER, JJ., concur.